FLEISCHMAN YEAST CO. v. FEDERAL YEAST CORPORATION.

(District Court, D. Maryland. May 9, 1925.)

**1. Patents ⬦328—1,449,103, for process for making yeast, valid and infringed.**

Hayduck patent, 1,449,103, effective March 15, 1915, under Act March 3, 1921 (Comp. St. Ann. Supp. 1923, §§ 9431a–9431h), for process for making yeast by employment of a nutrient solution, containing essentially sugar material and yeast-nourishing inorganic salts, and the neutralization of excess acidity during period of propagation, *held* valid and infringed.

**2. Patents ⬦328—1,449,127, process for making yeast, invalid for want of patentable invention.**

Nilsson and Harrison patent, 1,449,127, for process for making yeast, *held* invalid for want of patentable invention.

**3. Patents ⬦68—Essentials of printed publication to serve purpose of anticipation stated.**

A printed publication to serve purpose of anticipation of patent must make clear and complete disclosures, but may be of foreign origin and unknown to patentee, or may disclose a process not reduced to practice commercially.

**4. Patents ⬦45—Commercial success is evidence of patentable novelty only if proof of anticipation and lack of invention is doubtful.**

Commercial success is not evidence of patentable novelty, if proof of anticipation and lack of invention is free from doubt, but, where clearness and completeness of prior publication are doubtful, commercial success, especially in crowded field, is strong evidence that matter was not obvious to ordinary mechanic.

**5. Patents ⬦36—Commercial success loses weight as evidence of invention, when claim in controversy covers only part of article or process.**

Commercial success of patented article or process as evidence of invention loses weight, when it is shown that claim in controversy does not cover whole of patented article or process.

**6. Patents ⬦32—Patentee, asserting commercial success as evidence of invention, has burden of showing that patent produced beneficial results.**

Where it is shown that claim in controversy or patent covers only part of patented article or process, patentee, in order to have commercial success considered as evidence of invention, has burden of proving that patent or claim in suit produced the beneficial results, and proof of commercial success is weakened by absence of explanation of part played by patents not involved.

**7. Patents ⬦112(3)—Grant of patent is prima facie proof of novelty and patentability.**

Grant of patent is prima facie proof of novelty and patentability.

**8. Patents ⬦120—As between copending applications, respective filing dates fix respective dates of invention in absence of other evidence.**

As between copending applications, respective filing dates fix respective dates of invention in absence of other evidence.

**9. Patents 167(1)—Specifications may be read and construed with claims for purpose of ascertaining true meaning.**

Specifications of patent may be read and construed with claims for purpose of ascertaining their true meaning and intent, though not for purpose of expanding or limiting them.

In Equity. Patent infringement suit by the Fleischman Yeast Company against the Federal Yeast Corporation. Decree in part for plaintiff and in part for defendant.

Mayer, Warfield & Watson, of New York City, for plaintiff.

Howson & Howson, of New York City, for defendant.

SOPER, District Judge. [1, 2] The Fleischman Yeast Company filed its bill of

complaint to enjoin the Federal Yeast Corporation against the infringement of patents No. 1,449,103 to Hayduck, and No. 1,449,127 to Nilsson and Harrison. The defendant's answer put in issue the validity, and, if the claims be narrowly construed, the infringement, of the patents. The first patent, which for brevity will be called 103, was based on an application filed October 30, 1920, by Frederick Hayduck of Germany, assignor to the Fleischman Company, and carries the effective date of invention of March 15, 1915, the filing date of Hayduck's corresponding German patent. The American patent was granted under the provisions of the Act of Congress of March 3, 1921 (41 Stat. 1313 [Comp. St. Ann. Supp. 1923, §§ 9431a–9431h]), permitting foreign inventors, whose rights to United States patents would otherwise have been forfeited on account of war conditions, to have such rights restored. The second patent, hereinafter called 127, was issued to Martin Nilsson and Norman S. Harrison, assignors to the Fleischman Company, on their application filed January 7, 1919. Both patents were issued on March 20, 1923, directly to the Fleischman Company as assignee.

Both patents relate to processes for the manufacture of bakers' yeast. The evidence shows that yeast is a broad term, which includes a wide variety of both wild yeast and cultivated yeast. Wild yeasts multiply rapidly, and, like weeds, tend to drive out the cultivated kinds. The latter have been cultured and bred for a variety of purposes. Race 12, obtained by pure culture in Germany, is regarded as the best bakers' yeast. The product, which is used in the baking industry, must possess special qualities and properties. Most yeasts, if placed in dough, either do not produce a sufficient quantity of gas to make a light loaf, or produce too much. They attack the gluten of the bread excessively, or spoil its texture, or form substances of unpleasant taste and odor. Bakers' yeast forms the right amount of gas, is favorable to the texture of the bread, and does not have an offensive taste or odor. It is of suitable color. Moreover, it has lasting qualities, while many other varieties rapidly deteriorate and become a slimy unattractive mass, unsuitable for bread making.

Yeast is a small cellular micro-organism. In its ordinary significance, it is a conglomerate mass of infinitesimally small cells. It multiplies by self-propagation, limited by the means of subsistence, and the quality and yield are greatly affected by the conditions under which propagation is carried on. Yeast has been manufactured for at least 50 years by innoculating a wort; that is, by preparing a clear liquid solution and stocking it with a small amount of seed yeast. Such worts include substances to nourish the yeast cells, and are called yeast nutrient solutions. It has been known to the art for a long period that yeast feeds upon sugar, nitrogen, its chief constituent, phosphorus, and other elements, and it has therefore been common practice to employ nutrient solutions containing these elements in yeast assimilable form. Thereby the number of cells and the total mass is multiplied. The field for investigation and improvement has been the composition of the nutrient solution, and the character of the process employed during the period of growth.

For many years it was the custom, in the commercial manufacture of yeast, to use cereal materials exclusively, namely, corn for sugar material, and rye and barley malt for nitrogen, phosphorus, etc. Molasses has also been used instead of corn, since it contains, not only sugar material, but also assimilable nitrogen and other ingredients necessary for yeast growth. All of the nutrient substances in cereals and molasses are organic in character; that is to say, they originate in the life processes of plants. It has also been ascertained that the yeast food may be supplied from mineral, or inorganic, sources, such as ammonium and phosphoric acid salts, containing nitrogen and phosphorus, and that yeast will thrive on substances of both sorts jointly used.

The process for the production of yeast, and the process for the production of alcohol have somewhat in common. But there are important differences, dependent upon which substance is to be made. In both processes, seed yeast is placed in a nutrient solution containing nitrogen and sugar. Nitrogen is the factor limiting the amount of yeast produced. If the production of yeast is desired, a high ratio of nitrogen to nonnitrogenous material must be maintained, for, when the yeast has absorbed the nitrogen, its multiplication ceases, and its remaining activity is expended in the production of alcohol. In order to obtain the greatest yield of yeast, the yield of alcohol must be restricted, or, if possible, eliminated altogether. On the other hand, in the production of alcohol, only so much yeast need be made as will actively ferment the sugar. In the first stage of the process, the yeast grows until the nitrogen is exhausted, whereupon the main fermentation begins, during which

the yeast attacks the sugar and converts it into alcohol. When the process is concluded, the yeast as such is discarded, although it has some value as food for cattle. Obviously, when alcohol is to be made, the fermentative powers of the yeast are chiefly brought into play, while its reproduction function is most employed when a substantial yield of yeast is the object of the process. The problems of the distiller and brewer on one hand, and of the yeast manufacturer on the other, are kindred but they are not the same.

The Fleischman business was established in 1869. It has grown to a great size, as indicated by the fact that the assets of the company amount to about $35,000,000, including nine manufacturing plants in various parts of the United States. It is the leading yeast manufacturer in this country. The history of the changes in its factory process during the past 20 years, culminating in those covered by the patents in suit, illustrate the efforts of the trade to secure an improved process and product. During this period, the company has made a substantial annual expenditure to keep abreast in its method of production with the development in yeast manufacture in this country and in Europe. It has employed a general superintendent of manufacture, a practical yeast manufacturer at each plant, and a corps of chemists who have continually experimented in search of improvements.

In 1904, and for a long time prior thereto, the Fleischman Company was using the so-called old process (O. P.) in which the raw materials for the nutrient solution consisted entirely of cereals, to wit, corn, rye, and barley malt. The average yield of yeast amounted to 12 per cent. of the raw material, and at the same time there was produced about 7 gallons of alcohol for each 100 pounds of material. About 1911 a new process (N. P.) was introduced. In it, corn, corn malt, barley malt, and malt sprouts were used. The most important change was the introduction of a process of aeration in which air was forced through the wort for the purpose of furnishing oxygen and thereby stimulating the multiplication of the yeast. The nutrient for the yeast was still obtained from cereal sources—sugar from the corn, and nitrogen from organic material, such as malt sprouts. From the new process, there were obtained average yeast yields of 28 per cent. of the raw material, and a certain amount of alcohol. In 1913, the Fleischman Company modified its manufacture by adopting the German Bak-

ers' (G. B.) process. This was practically the same as the N. P., except that corn malt was eliminated, and there was stronger aeration. Sugar and nitrogen were still obtained from organic sources. The average yeast yield was increased to about 35 per cent., and the alcohol yield was about 2½ gallons per 100 pounds of material.

In 1917, the G. B. process was superseded by what was called the German Bakers' Molasses (G. B. M.) process. This was during the war period, and it was necessary to conserve grain. Molasses was substituted for corn. With this process an average yeast yield of 33 per cent. was obtained, and about the same alcohol yield as before. With the exception of the substitution of molasses for corn, the process in other respects was the same as the G. B. process. It is noteworthy that this process represented the best method known to the Fleischman Company in the manufacture of yeast from molasses, and, secondly, that, although the method was cheaper, the yeast product was of a somewhat inferior quality. On the latter account, the company reverted to the G. B. method as soon as the government restrictions on grain were removed in 1918, notwithstanding an increased cost of production.

This was the situation until 1919, when the Fleischman Company, having acquired by assignment the inventions covered by the patents in suit, began the manufacture of yeast under the processes therein disclosed. The change is described as revolutionary. The use of cereals was abandoned entirely, and the wort was made from beet molasses, with the addition of ammonium phosphate and of aqua ammonia, added fractionally during the process. The solution therefore contained nutriment from both organic and inorganic sources. The yield of yeast was increased to 65 per cent. of the materials, and it was no longer necessary to make alcohol along with the yeast.

With these preliminary statements, in mind, the validity of the patents may now be examined. Hayduck's patent, No. 103, is of a broader character than No. 127, and will be first considered. Specifically it relates to a process for the production of bakers' yeast by propagation in a solution containing sugar materials and yeast-nourishing inorganic salts. It suggests the use of molasses as a suitable source of sugar, and the employment of ammonium salts as a source of nitrogen and other nutriment. This, however, is but a part of the process. The specification of the patent shows that

there takes place in such solutions a considerable increase of acid content, for the most part of an inorganic nature. When inorganic salts are used, the chemical compounds are split up, the basic parts going to supply to a large extent the nutriment needed by the yeast, while the acid radicals combine with other substances to form inorganic acids. The accumulation of acid products or free inorganic acids influences the yeast unfavorably, if permitted to act unrestrainedly upon the yeast for any considerable length of time. Hence the inventor, in order to prevent the harmful effect of the acid upon the yeast, teaches a special means of control by the addition of an antacid substance. Calcium carbonate may be employed for the purpose of neutralization, or other basic or antacid substances which also supply nitrogen to the yeast, for example, ammonia, may be used. The advantage of the process is that by the supply of nutriment through the addition of inorganic salts and by the neutralization at the same time of the deleterious effect of the discarded acid radicals of the inorganic salts, unprecedented yeast yields may be obtained.

There are fifteen claims in the patent, all of which except claims 5, 6, 9, and 10 are relied upon by the plaintiff. Claims 1, 2, 3, and 8 are referred to as typical. It will be sufficient to set out the terms of claim 8.

"8. The process of manufacturing yeast which comprises preparing a yeast nutrient solution and propagating yeast therein with aeration, said yeast nutrient solution containing essentially sugar material and yeast-nourishing inorganic salts including ammonium sulphate which is adapted to be at least partially assimilated by the yeast and from which during such assimilation components are liberated which tend increasingly to acidify the nutrient solution during propagation, and during the period of propagation, neutralizing the deleterious excess of acidity."

The Federal Yeast Company, the defendant, is a Maryland corporation, and operates a yeast factory in Baltimore. It does not deny infringement of the broad claims of the patent, but defends on the ground that the patent is invalid for anticipation and lack of invention, in view of the disclosures of prior patents and printed publications (R. S. § 4886 [Comp. St. § 9430]), which it will be now necessary to examine in detail. It will be observed that patent 103 covers two main steps: (1) The employment of a nutrient solution containing essentially sugar material and yeast-nourishing inorganic salts; and (2) the neutralization of the excess of acidity during the period of propagation. As to the first step, it is clear that the claims of the patent are very broad. Molasses is mentioned in claims 12, 13, and 14 as a suitable source of sugar, and the specification, in its technical formula, includes salts of ammonium, phosphorus, potassium, calcium, and magnesium among inorganic salts to be used in the solution. It is clear, however, that the phrase "essentially sugar material" is not confined to molasses, but includes raw and refined sugar, and other sugar-containing materials, and that the phrase "yeast-nourishing inorganic salts" is comprehensive, and is not confined to the particular salts named.

Yeast nutrient solutions, consisting of sugar materials and inorganic salts, have been long used in the laboratory in growing yeast for scientific investigation, and have also been proposed for the production of seed yeast industrially. The British patent to Mohlhant of 1913 prescribed a method for making seed yeast to be used in the distillation of molasses by the employment of a pure sugar solution with inorganic salts. The Sexauer patent of 1896 taught a method for the reconditioning of yeast made from molasses which was unstable and of bad odor. After production, it was placed for complete growing in a sugar solution with nutrient salts. The salts may have been organic or inorganic, and it is not clear that there was further propagation of the yeast; the final action being apparently confined to the enlargement or swelling of the yeast cells.

In addition to these instances of pure sugar solutions, the prior art shows a number of instances in which sugar material other than a pure sugar was utilized, together with inorganic salts, for the production of yeast. Of this class is the patent to Oswin W. Willcox of 1912. Dr. Willcox is the defendant's expert in the case at bar, and his testimony will be hereinafter considered. The patent covered a process for the utilization of waste sulphite liquor from paper pulp mills. The liquor contained a certain percentage of sugar, which the patentee employed, together with ammonium salts to furnish nitrogen and phosphorus to the yeast. It was an illustration of the employment of a nutrient solution, consisting of sugar material and inorganic salts in the commercial manufacture of yeast.

The British patent to Elion of 1895 covered the manufacture of bakers' yeast from molasses and sugar syrups, with the addi-

tion only of phosphoric acid in a combined state, for instance, ammonium phosphate. The British patent to Lubbock in 1882 taught that, when the object was to increase the growth of yeast in solutions to be fermented, the deficiency of the sugar material, such as molasses, in nutriment, could be remedied by the addition of certain inorganic chemical compounds, from which yeast possesses the power of assimilating nitrogen. Similar teaching is found in the French patent to Societe Gozern-Grimma in 1904. Reference may also be made to articles by Henneberg hereinafter mentioned in another connection.

It is unnecessary to enter into a more detailed description of the processes covered by the inventions cited, for it is clear from the statements of Hayduck himself that there is no patentable novelty in the first step of patent 103. In an address published in Germany in the Zeitschrift fur Spiritun-industrie in 1910, he said:

"It is a fact long known to fermentation physiologists that yeast can nourish itself not only from amides, that is, from organic nitrogenous substances, but can also take up nitrogen in the form of ammonium salts and transform it into albumin. Among us it was Dr. Henneberg who first tested the matter and carried out yeast-culturing experiments with aeration. Through the addition of ammonium salts with simultaneous addition of suitable nutritive salts he has succeeded in obtaining extraordinary increases in the yields of yeast, and, not only that, he was able to show that by this addition of inorganic ammonium salts the yeast may be fattened in the true sense of the word; that is, its albumin content may be increased up to 63 per cent. in the dry substance."

Reference may also be made to United States patent No. 1,449,102, which was granted to the Fleischman Company as assignor of Hayduck on March 20, 1923. This invention is limited to the process of manufacturing yeast which comprises the preparation of a yeast nutrient solution and propagating yeast therein with aeration; the solution containing essentially sugar material and yeast-nourishing inorganic salts, in amount sufficient to supply all essential yeast foods, and being of such initial dilution that the salts are innocuous to the yeast. It will be seen to cover the first step only of patent 103, but the claims are limited to a very high dilution of the solution. The following quotation from the specification demonstrates that the first step in patent 103 was well known to the art:

"It is a known fact that there may be added to the usual cereal worts and mashes, which serve for the manufacture of yeast or alcohol, inorganic salts (in particular, ammonium salts, potassium salts, phosphoric acid salts, etc.), for the better nourishment of the yeast; and that the yeast will take from these salts some ingredients which are of value to it. It is further known that yeast also may numerically increase as to a count of the total yeast cells present in solutions which contain, besides sugar, only inorganic salts as nutrients. Such solutions are used in the laboratory for the propagation of yeast. Nutrient salts have also been proposed for use in the industrial manufacture of yeast, as is shown in United States letter patent to Willcox, No. 1,044,615, proposing the growth of yeast in waste sulphite liquor obtained in the manufacture of cellulose, which received a complementary addition of inorganic nutrient salts."

It follows that any patentable novelty found in patent 103 must be based upon the second step of the process in which excessive acidity is neutralized, or in the combination of the two steps. Indeed this point is emphasized by the following statement in the specification of patent 103, wherein reference is made to the copending application for patent 102, as follows:

"An outstanding novel and technically important feature of my present invention as compared with the process described and claimed in my aforesaid copending application resides in the fact that by means of the careful neutralization of the aforesaid acid, components set free are neutralized either entirely or to an extent that they no longer affect the yeast unfavorably whereby yeast yields may be obtained which have not been obtainable hitherto by any process and which could not have been predicted from the known facts."

It is not denied that the step of neutralization disclosed by the patent was novel in the commercial manufacture of bakers' yeast, but it is claimed that it was clearly foreshadowed and anticipated by certain patents previously granted and certain printed publication in the prior art. Since this is the crucial point in the case, it is necessary to examine these references with care. The parties were assisted in the interpretation of the patents and technical publications by expert testimony. The expert for the defendant was Oswin W. Willcox, a chemist with the degree of Doctor of Philosophy from the University of Chicago. He had had practical experience as a chemist in the fer-

mentation industry in connection with the Scientific Station for Pure Products in New Jersey. This concern was a consulting and engineering laboratory for manufacturers of food and beverages, including brewers, distillers, and yeast manufacturers. It maintained a school for instruction in scientific methods of operating the plants. It also published a journal called "Pure Products" for manufacturers of food and beverages, and a journal called the "American Distillers' Review," devoted to the interest of distillers and yeast manufacturers. Dr. Willcox was the managing director of the laboratory, and the editor of the two publications. During the years 1908 to 1915, he was generally familiar with the literature of the art, so that it would appear, both by technical training and by experience, he was qualified as an expert fermentologist. The expert on behalf of the plaintiff was Dr. Arthur Becket Lamb, professor of chemistry and director of the chemical laboratory at Harvard University, and editor of the Journal of the American Chemical Society. He received the degree of Doctor of Philosophy at that institution, and had also studied abroad. While he had not been employed in fermentation industries, he had made observations in yeast factories, and his training and researches undoubtedly familiarized him with the problems of fermentology and qualified him to interpret the publications introduced in evidence. As might be expected, there was considerable difference in the opinions of the experts, and the problem of the court has been to determine, by reference to their testimony and the publications themselves, which witness has given the more correct and reasonable interpretation.

The first citation is the work of Molinari on "Industrial Chemistry," published in 1913. It contains a passage relative to the use of beet molasses as a material for the manufacture of alcohol. It describes a discarded process in which the molasses was diluted, slightly acidified with sulphuric acid, and boiled in a current of air. After cooling, the alcoholic fermentation was initiated by the addition of vigorously fermenting liquid, and the excess of acid which formed was neutralized with chalk. The defendant says that there was but a short step from this process to that described in the patent in suit, referring especially to the statement in the specification of patent 103 that the neutralization of acids may also be advantageous in processes involving the fermentation of pure sugar solutions in the presence of inorganic salts, even when the manufacture of yeast is not intended. But there is a marked distinction between the two processes. Patent 103 describes a process to make yeast and the neutralization of the acids released when inorganic salts are added to the nutrient solution. Molinari described a process for the manufacture of alcohol then already in disrepute because of inherent difficulty. No inorganic salts were used, but the acids produced were organic acids, formed from the sugar material, due in part to the normal quality of the yeast, but in greater measure to the presence of infectious or wild yeast. It is also noteworthy that in another part of the work, under the head of "Fermentation," Molinari gives a process for making alcohol, and distinguishes it from the procedure in yeast factories for the manufacture of yeast from grain, with the addition of sodium or ammonium phosphate. The increase in the quantity of yeast, and the decrease in the quantity of alcohol in the aeration process is noted, but there is no suggestion of the neutralization step in the process of patent 103.

The Swiss patent to Pollak of 1913 is entitled "A Process for Acidification of Fermentative Substances by Use of Ammonium Compounds." It referred to the custom in the fermentation industry of preparing an acid nutrient solution *before* introducing seed yeast in the wort. For this purpose, lactic bacteria were placed in the wort, whereby a part of the sugar was changed into lactic acid, a substance destructive to other harmful micro-organisms, but, after a certain amount of the lactic acid was made, it prevented the further growth of the bacteria. Pollak taught that ammonia or other strongly alkaline ammonium compounds should be added to neutralize the excess acidity, whereby the lactic bacteria would again become active and more lactic acid would be formed. The advantage claimed for the process was that more acid is formed than in previous processes, and a greater quantity of ammonium salts and pressed yeast are produced; the salts acting in the manufacture of alcohol as a yeast nutrient and stimulating agent. The distinction between this process and that of patent 103 is obvious, since, in the former, increased quantities of acid were formed, whereas in the latter the purpose of the neutralization was to cut down and destroy the acid thereby increasing the yield of the yeast.

By far the greatest emphasis is placed by the defendant upon the publications of W. Henneberg, a German chemist. He was the chief of the Chemical Division of the Tech-

nical-Scientific Laboratory of the Institute for Fermentation Industries in Berlin. The Institute was founded by the fermentation industries of the German Empire, including brewers, distillers, and yeast manufacturers, for the purpose of studying the scientific and practical problems of the industry, and rendering assistance to the trade. It conducted a trade school for distillers and yeast makers, and Henneberg was in charge of the instruction. The patentee, F. Hayduck, was also a German chemist connected with the Institute. In the course of their investigations it had been noted that under certain circumstances yeast was poisoned and killed when brought into contact with certain nitrogenous substances such as flour and peptones. The Institute therefore undertook investigations to discover the cause of the phenomenon. To Hayduck was assigned experiments on a large scale in breweries. To Henneberg was assigned the duty of working out the question in the laboratory, with pure yeast cultures. The publications introduced in evidence are the reports of the results of his investigations to the Institute and its members. The first Henneberg article was published in a German publication circulating among brewers, the Wochenschrift fuer Brauerei for 1907. The title of the article is "On the Behavior of Culture Yeast Races in Compounded Nutritive Solutions." It was published in installments in several successive issues of the journal. It is very long and difficult to analyze and digest. It recounts the result of some 377 experiments made by the scientist. Dr. Lamb, the expert for the plaintiff, testified that it required four or five days of laborious work for him to completely understand the results. Dr. Willcox, the expert for the defendant, conceded that careful study was required to appreciate it. It is perhaps the most important article cited as anticipatory of the patent. Its importance lies chiefly in the fact that it contains data of experiments in which yeast was cultivated in sugar solutions with the addition of inorganic nutritive salts, to which chalk and other neutralizing substances were added.

In his researches in 1907, Henneberg undertook a scientific study of the metabolism of yeast under special conditions. He observed, amongst other things, the fermentation and the growth of the yeast cells, the flocculence of the yeast, the character of the foam, of the sediment, the microscopic appearance, the increase of acidity, and the number of dead cells. He took great pains to secure material for seeding, free from infection. He experimented with seven culture yeasts, including two top fermenting brewery yeasts, three bottom fermenting brewery yeasts and two distillery yeasts, of which one was race 12, especially suitable in the manufacture of bakers' yeasts. He employed a stock solution consisting of .5 per cent. cane sugar, .5 per cent. potassium acid phosphate, and .2 per cent. magnesium sulphite in distilled water. His first series of experiments involved the use of the yeasts in the stock solution with the addition of one or another of five ammonium salts as nitrogenous nutriment. Of the salts one was organic and four inorganic. He thus had 35 experiments with this material. He used the solutions both with and without the addition of chalk. Thereby the number of experiments with ammonium salts was increased to 70. The experiments were further elaborated by transplantations of the yeast in each solution. In order to ascertain the effect of a given solution upon the vital powers of the yeast, it was permitted to grow and develop therein. A portion was then transferred to a second solution of the same character and from this to a third, and so on until the vital powers of the yeast were exhausted. Thus the favorable or unfavorable character of the solution was determined.

There were a large number of other experiments in which, instead of ammonium salts, asparagine, an organic nitrogenous compound found in beet molasses, was used as a nitrogenous nutriment, with and without the addition of chalk. Finally the work was concluded with a number of experiments conducted to ascertain the yield of alcohol. Since the experiments with ammonium salts most nearly resemble the process in the patent, the results obtained therefrom are the most pertinent to this discussion.

Dr. Willcox draws certain broad conclusions from the article. He states that there was an initial acidity in the solution; that when the yeast started to grow and multiply, nourishing itself upon the inorganic salts, the solutions became increasingly acid. As the acid increased in amount, fermentation and multiplication of the cells would stop, and a large quantity of yeast would die. The yeast would not survive successive transplantations from one solution to another. When the same solutions, however, were taken without any other change, except the addition of chalk, the fermentation was found to be very good, much yeast was produced, the dead cells were few and far between, and the power of the yeast to

withstand successive transplantations was greatly increased.

It is apparent that, if these conclusions are clearly set forth in the article, then all or substantially all of the ground covered by the patent was anticipated. It is necessary, therefore, to examine the article with care in order to ascertain whether the generalizations of Dr. Willcox are justified. For this purpose the testimony of Dr. Lamb, the arguments of the defendant's brief, and the article itself, have been minutely examined. What, in fact, does the article show as to the effect of chalk upon the quantity of the yeast produced? In a general summary at the beginning of the article, Henneberg states the most important results noted from solutions with ammonium salts, and at the end he gives a general conspectus of results and conclusions. The most pertinent headings employed by him are "Mortality of the Cells," "Quantity of Yeast," "Favorable and Unfavorable Nutritive Solutions"; the last category having particular reference to the number of transplantations the yeast would endure.

When the mortality of the cells and their power to withstand repeated transplantations are discussed, there are many statements, both in the tabulation of particular experiments and in the general conspectus, of the benefits derived by the addition of chalk. In general, the same observations were made from all of the experiments, including those in which ammonium salts and those in which asparagine furnished the supply of nitrogen. It was found that, when the nutritive solution has an acid reaction, the cells for the most part quickly die off, more slowly or considerably later when the reaction is neutral or weakly alkaline. Many lime salts, such as calcium chloride, gypsum, calcium phosphate, or lactate of lime delay the dying off. Henneberg thought it probable that acids are formed in the interior of the cells which cause their death unless certain salts (lime salts above all, chalk or soda or ammonium or the like) are present. It is noteworthy that Henneberg emphasizes, not only the beneficial effect of alkaline substances, but also of lime salts, many of which are of neutral or acid reaction.

It was also found that the oftener the yeasts are propagated (by transplantations), the more rapidly in general do the cells die. In the long run, the nutritive solutions do not agree with the yeasts. Without chalk, one or two transplantations could be made. With chalk three or more could be made. By the addition of chalk, solutions

8 F.(2d)—13

containing ammonium salts or asparagine which otherwise were very unfavorable, became for the most part very favorable; also in the second transplantation, in acid solutions with asparagine, when all development had ceased or was going on to a very limited extent, the subsequent addition of chalk brought forth a good multiplication and a powerful fermentation within 24 hours.

The main factors which the investigator has here in mind are the longevity of the yeast, its power to survive under varying conditions, and its fermentative power in the production of alcohol. However, it may be fairly inferred that a solution unfavorable to length of life would likewise be unfavorable to yields of yeast. But it must be remembered that the scientist is dealing with yeast culture under special conditions. He is not endeavoring to obtain large quantities. The test to which a particular yeast in a particular solution was subjected extended over a period of days without respect to the much shorter period of hours in duration in yeast factories. It is nowhere suggested that, if yeast growing on a commercial scale is intended, solutions with chalk or other antacid substances should be used. The statement as to good multiplication in asparagine solutions above referred to has been particularly emphasized by counsel for the defendant. As herein set out, it is out of proportion to the general statement of results. As it appears in the article, it is an incidental reference only, and does not warrant a generalization that good multiplication may usually be expected from the addition of chalk.

These observations appear the more just when Henneberg's own conclusions as to the quantity of yeast are examined. As to the ammoniacal solutions which were used with and without chalk, it is stated that the quantity of yeast was very abundant in five specified instances, and that the quantity was good or tolerably good, but out of proportion to the scant fermentation in eight named instances. No suggestion is here made that chalk affected the result. In the general conspectus, under the heading "Quantity of Yeast," reviewing all the experiments it is said, "Very much yeast is found in the solutions without chalk (where chalk had been added this is much more difficult to determine)," and the fermentation was correspondingly powerful in some 30 specified solutions. Then follows a report of 16 experiments in which much yeast but little fermentation was observed, and finally a report of 21 experiments in which much yeast

but no visible fermentation was observed. There is no stated conclusion that the quantity of yeast was increased by the use of chalk. The only conclusion which Henneberg states is, that under certain conditions there can occur in liquids with fermentable sugar, a multiplication of yeast without a corresponding fermentation exhibiting itself. When the constituents of the solutions producing the largest quantity of yeast in these experiments are studied, it is found that in some cases chalk is used, but in many more it is not used.

No firm conclusion can be drawn from this study of the beneficial effect of chalk upon the quantity of yeast. On the contrary, one who sought guidance chiefly for the production of yeast in large quantities would be led to abandon rather than to adopt the addition of chalk. Dr. Lamb testified without contradiction that from a careful examination of the tabulated results, he had ascertained that, in experiments with race 12, either much or very much yeast was obtained without the use of chalk in 4 of the 5 ammonium solutions, and in nearly every instance with some one or the other of the remaining 6 yeasts, some yeast growth was obtained in all of the 5 solutions without the addition of chalk. When he added the chalk, there is only a single instance where much yeast was reported. That instance is solution 5. With it there are several instances cited where yeast growth occurred when chalk was used, but with the same solution there are similar statements about the growth of yeast before the addition of chalk.

The article is manifestly the work of a patient investigator and able scientist. Much is suggested and expressed as to the effect of acid upon the mortality of the yeast, its ability to withstand repeated transplantations, and upon the quantity produced. The beneficial effect of alkaline and other substances in certain respects is indicated, but it is not clearly announced, if indeed Henneberg himself perceived it, that the addition of antacid substances to sugar solutions in which yeast is nourished during propagation by inorganic salts will be accompanied by increased yields of yeast.

Henneberg continued his researches, and in 1908 published an article in the Wochenschrift fuer Brauerei, under the title "On the Influence of Flour and other Nitrogenous Substances, Salts and Acids on the Duration of Life and Fermentative Power of Yeast in Distilled Water with Cane Sugar and in Worts." This work was along the same general lines as the experiments of 1907, but the observations were extended to include grain, flour, wheat, and protein substances. The purpose was to cover the field of possible substances which might poison yeast during fermentation. A summary of the conclusions reached was published in the Pure Products Magazine, with which the defendant's expert, Dr. Willcox, was connected, later becoming the editor. It was there reported that flour, egg albumen, pepton, lecithin, and inorganic ammoniacal salts in their influence upon yeast exhibit striking resemblances, which show themselves in the following particulars: (1) Nonpoisonous or toxic in pure distilled water. (2) More or less toxic in distilled water with sugar infusion. (3) Not toxic in hydrant water (of the Institute) with sugar. (4) Not toxic as soon as lime salts, carbonates, or bases are present in the sugar solution in very slight amount, or other salts in greater concentration. (5) In the presence of these substances they are mostly of excellent nutritive value. (6) Flour, egg albumen, pepton, citrate, and oxalate of ammonia kill off the under fermenting beer yeast in much more vigorous degree than they do the top fermenting distillery yeast; only the inorganic ammoniacal salts are poisonous for both yeasts in exactly the same degree.

It was stated that the kind of substances necessary to render such salts innocuous were above all acid-destroying substances, namely, bases and carbonates; likewise all the lime salts with the exception of the oxalate of lime, and, in much greater concentration, magnesium sulphate, ammonium sulphate, potassium sulphate, etc. The lime salts operate upon the acids within certain limits so that they are not at all or only slightly injurious in effect. It must therefore be assumed that, in the process of conversion of the nitrogen compounds named, free acids are generated in the interior of the cell which are normally rendered innocuous immediately by the salts just mentioned.

It was also shown that the conditions in the case of ammonium salts are very simple. The yeast, as is well known, may with great advantage use them for its production of albumin. For this purpose it must of course split them up. The acid which has been in combination with the ammonia is thus liberated. If the latter is carbonic acid, no poison develops. If they are only slightly injurious organic acids, they may be rendered innocuous by combustion. Citric and oxalic ammonia salts have a poisonous effect on beer yeast because these acids are extremely toxic for this yeast. For the same

reason, the inorganic ammoniacal salts, with the exception of the carbonate of ammonium, are extremely poisonous in effect.

It is apparent that there is much similarity between this investigation and that of 1907. The deleterious effect of acid upon the yeast is again pointed out. Furthermore, the source of the acid when ammonium salts are used is definitely explained. Similar remedies for the toxic effect are suggested, but it is made more clear that, not only acid-destroying substances, such as bases and carbonates, will accomplish the purpose, but also all of the lime salts (except oxalate of lime), many of which are distinctly acid in character.

It may be further noted that the experiments were conducted in distilled water, and that, when tap or hydrant water is used, no toxic effect is found. It is perhaps unfair to conclude that a person skilled in the art would be led to believe that all unfavorable poisonous effect from the use of the substances in question would be obviated by the use of ordinary water. It is well known that in most cases lime is present in such water, and this fact may have suggested to the experimenter the use of lime salts, but at least it is noticeable that the experiments were conducted in a medium not available for manufacturing purposes, and that much of the significance of the article for the practical worker would be lost once he understood that distilled water only was used.

One is led to believe that, both in 1907 and 1908, Henneberg, who was experimenting for the benefit of the Institute for Fermentative Industries, was interested in the vital fermentative power of yeasts rather than in the production of yeast for baking purposes. The title of the 1908 article and the contents of both articles seem to justify this conclusion. The diseases to which yeast is subject, from the presence of bacteria and other causes, were naturally the source of considerable concern to the industries, and the subject of study on the part of the institute. Henneberg states specifically in his 1907 article that he experimented with two top-fermenting yeasts (suitable for the manufacture of lager beer), three bottom-fermenting yeasts (suitable for the manufacture of ale), and two distillery yeasts. It is of fundamental importance in the brewing and distilling industries to employ the kind of yeast best suited for a given alcoholic fermentation. In distilleries where the production of alcohol in large quantities is desired, high multiplying power in the yeast is required. Hence Henne-

berg studied the action of several species of yeast, and amongst other yeasts, race 12, a distillery yeast which, because of its high power of multiplication, is most suitable for the production of yeast for baking purposes.

But there is no mention in the 1908 article of the quantity of yeast produced, and in 1907 his statements on this subject were in quite general terms; the quantity of yeast produced being spoken of as a moderate amount, much, or very much yeast. No attempt is made to give exact quantities or proportions. It is true that yeast grows in the course of alcoholic fermentation, but only to a relatively limited extent compared with the quantities produced in yeast manufacture. The account of yeast growth in the experiments of 1907 may fairly be referred to the growth which precedes the main stage of fermentation, during which the multiplication of the yeast is checked and its activities are directed to the conversion of sugar into alcohol.

No reference is made to the difference of time of the processes in the fermentation industries on the one side, and in the manufacture of yeast for baking purposes on the other. In the former, the processes are of considerably longer duration. Henneberg states in the 1908 article that it is striking that flour operates most rapidly of all, pepton and ovalbumen somewhat less quickly, and the inorganic ammoniacal salts only after several hours.

Again he states, in the Brennerei Lexikon, a distillery encyclopedia published in Germany and edited by Hayduck, in a passage upon the influence of ammonium salts on yeast in distilled water with sugar, that the salts in tolerably large amounts—3 to 4 per cent.—have a strikingly stimulating action on the raising power of the yeast. After a somewhat longer action, for example, 24 hours, there results, however, a strong poisonous action and rapid dying off of the cells which is the more pronounced the more the salt is dissociated—ammonium salts most. It is noteworthy that the process of the Fleischman Company, under the Hayduck patent, is complete in 24 hours.

The article by Henneberg in 1910 in the Zeitschrift fuer Spirituinindustrie, is less convincing than those of 1907 and 1908 as an anticipation of the patented process. It is entitled "Glycogen Content of Different Nutritive Yeast Cultures." Glycogen is a carbohydrate, which, under certain conditions, yeast absorbs as a source of nutriment, but ordinarily, if sufficient nitrogen is fur-

nished, glycogen is not stored up. A solution which provides adequate nourishment yields a yeast which is free from glycogen and rich in albumin, and bakers' yeast should be of this character. The experimenter used 41 synthetic nutrient salt solutions, of which experiments, 2 are particularly insisted upon as disclosing the step of neutralization. These are instances in which nitrogen was furnished the yeast by the addition of ammonium phosphate, which was neutralized by the use of lactic acid or calcium lactate. In the chemical action which ensued, the lactate is split up, forming a calcium salt of the strong phosphoric acid, and releasing the weaker lactic acid in the solution. This process, in substance, amounts to the substitution of a weaker organic acid for a stronger inorganic acid, but the organic lactic acid set free is confessedly a strong organic acid, and the process by which one acid, through a weaker one, is substituted for another can hardly be held to foreshadow clearly the process covered by the patent.

Finally reference is made to a book published by Henneberg in 1909, and referred to in the evidence as Henneberg's Praktikum. It purports to embody everything of importance so far as practical conditions are concerned. As distinguished from the scientific articles in the Wochenschrift, it is a practical handbook containing valuable information for the benefit of practical men engaged in the industries. The passages of the work referred to are for the most part based upon Henneberg's articles already discussed. For the production of culture yeast, the author gives certain formulæ of nutrient solutions with ammoniacal nitrogen or asparaginic nitrogen, prepared with distilled water, and the addition of chalk or soda or lactate of lime. Favorable and unfavorable nutrient solutions are also discussed, wherein it is stated that the judgment of them depends upon the number of transplantations which can be grown, that acidity is the dominating factor, and that the solutions become favorable with the addition of certain substances, such as lime salts, chalk, gypsum, etc.

In the same work the author describes the process employed in a molasses yeast factory. He states that in the aeration process, one can use, instead of a wort, molasses, to which must be added nitrogen, in the form of yeast extract, or malt sprouts; an addition of phosphates (superphosphate, ammonium phosphate) has likewise been found to be of advantage. No hint of the addition of any neutralizing or acid-destroying sub-

stance is made. Nowhere in this work does Henneberg show the practical advantage to be gained in the manufacture of bakers' yeast from the use of a neutralizing substance to offset the deleterious acidity produced in the process. If he had then already discovered by his researches that such a process would be accompanied by greatly increased yields of yeast, he made no such disclosure in his treatise. The character of the work is such as to lead one to expect that such a disclosure would be made if the author were in possession of the fact. It is quite clear that he included the results of his most recent investigations of the two prior years. If it were obvious to him that he had made a discovery of great practical value in the manufacture of yeast, it is difficult to understand why he would not have told it while freely making public other matters which were of value in the fermentation industries.

It is not enough to show that, in the formulæ for pure yeast cultures, neutralizers are included. Yeast culturing has a very definite meaning. It is a scientific experiment on a very small scale. It is performed with a very small quantity of yeast, observing its growth and removing for transplantation minute portions which spring from a single cell and presumably are very pure. As performed by Henneberg, the observations of even a single specimen was a matter of days. He unquestionably announced that under these artificial conditions, and with distilled water, an excess of acidity was deleterious, but on the question of quantity his findings were vague and uncertain. Much less were they demonstrations of what might be expected in the factory.

The distinction as to quantity between scientific culturing experiments and factory processes is not merely in the scale of the operation. The difference is fundamental when the aim is a substantial yield. When bakers' yeast is manufactured for the market, the amount of seed yeast placed in the nutrient solution may be only 2 or $2\frac{1}{2}$ per cent. of the material used, and at the end of the process, it will have grown to a quantity twenty-five times as great. Compared with this production, the inadequacy of Henneberg's disclosures is apparent. So far as can be ascertained from his reports, the enlargement and multiplication of the cells which he considered satisfactory in yeast culture, resulting for instance from the use of chalk, may have been quite insignificant from the manufacturer's standpoint. There is no data from which a person skill-

ed in the art, or even a scientist, could calculate the yield to be expected under normal factory conditions.

It is noteworthy that in 1909 and 1910, Hayduck himself, who collaborated with Henneberg, did not interpret the researches of Henneberg in the same manner as is now done by Dr. Willcox, and, furthermore, that he did not altogether agree with Henneberg's theories. Henneberg thought that the poisonous action developed in the manufacture of yeast was due to acid which developed in the yeast cell. Hayduck did not regard this as proved, but believed that the poisonous action was due to a specific poison rather than to too much acidity. If the learned doctors disagreed, it can hardly be said that their teaching was obvious to persons merely skilled in the practical art. Furthermore, Hayduck in 1910 apparently did not know the benefit to be gained from the addition of an alkali to the wort. An excerpt has already been quoted from an address made by him in that year. He was speaking to an association of spirit manufacturers of the possibility of increasing the quantity of yeast remaining in distillery slop at the end of the fermentation, so that the value of this refuse product as food for cattle might be enhanced. His proposal was that the nutriment of the yeast should be enriched by the addition of ammonium salts, which, as a practical matter, was too expensive for the purpose. Nevertheless he showed that, if the quantity of yeast was the end in view, ammonium salts were very advantageous for the purpose. But he was quite silent on neutralization. If Henneberg had disclosed, either as a theoretical or practical conclusion, that neutralization would result in increased volume of the product, one would expect to find some mention in Hayduck's 1910 address. It appears therefore that neither of the men best qualified to understand the publications gave them the meaning now attributed to them by the defendant's expert.

The plaintiff urges, with propriety, that, in determining whether the matter covered by the Hayduck patent became obvious through the Henneberg publications to the ordinary person, skilled in the art, the case of Dr. Willcox, the defendant's expert, should be considered. From 1908 to 1915 he was the manager of the Scientific Station of Pure Products, which in some respects occupied a position in this country similar to that of the Institute for Fermentation Industries in Berlin. In the course of his duties he advised yeast manufacturers as to their processes, and conducted a school for the instruction of younger men to enable them to understand the yeast business. He read the principal journals and published in Pure Products extracts from articles appearing in foreign countries, especially Germany. It has been pointed out that the conclusions of the Henneberg article of 1908 were published in Pure Products.

Dr. Willcox secured a patent in 1912 for a process for the manufacture of yeast, which was devised in order to utilize the sugar content of the waste sulphite liquor from paper pulp mills. In his patent there is no mention of neutralization. He explains (1) that the yeast he was using was rather resistant to acid, having become accustomed to the sulphite liquor, and (2) that the amount of sugar and mineral nutriment was rather small, so that there was not enough acidity developed to render the process recommended by Henneberg necessary. But there is nothing in the Willcox patent to suggest that in any case a neutralizer would be necessary. So far as the document discloses, no idea of the necessity for neutralization was present in the inventor's mind. Moreover, there is no evidence to show that Dr. Willcox made any use in his work, as adviser or instructor of yeast manufacturers, of the Henneberg disclosures on neutralization. The only reasonable conclusion is that the benefits of the process were not then obvious to him. The information may have been almost within his grasp, but it remained for the patentee to demonstrate and clearly disclose it.

[3] The law as to the nature of a printed publication which will serve to anticipate a patent is well settled. It is of course true that, if the prior publications are clear, although of foreign origin, they serve the purpose of anticipation, even although the patentee was unaware of them and the process had not been reduced to practice commercially. Bone v. Marion County, 251 U. S. 134, 40 S. Ct. 96, 64 L. Ed. 188. Nevertheless the disclosures must not only be clear, but also complete, and, if the patent possesses a new element, it will be sustained. Stead Lens Co. v. Kryptok Co., 214 F. 368, 131 C. C. A. 144; Krajewski v. Pharr, 105 F. 514, 44 C. C. A. 572.

If the foreign patents and the Henneberg articles cited against the patent are compared with its disclosures, it will be seen that, so far as the step of neutralization in the manufacture of bakers' yeast is concerned, the former are vague and indefinite, while the latter makes specific and clear

statements that the employment of alkaline substances are of great advantage in the quantity and quality of the product. It is one thing to show that, when yeast is used in fermentation processes, its fermentative power and duration of life will be enhanced by offsetting deleterious acidity or that in producing pure yeast cultures in the laboratory with distilled water, antacid substances should be used, and it is quite another to demonstrate that, when the end in view is the production of large quantities of yeast for its own sake, neutralizers may be advantageously employed. As has so often been said in patent cases, it is the last step which counts. Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177; Barbed Wire Patent, 143 U. S. 275, 12 S. Ct. 443, 36 L. Ed. 154; Badische Anilin & Soda Fabrik v. Kalle (C. C.) 94 F. 163, affirmed in 104 F. 802, 44 C. C. A. 201; Permutit Co. v. Harvey (C. C. A.) 279 F. 713; Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33; Loew v. German-American Filter Co., 164 F. 855, 90 C. C. A. 637.

[4] The testimony bearing upon the commercial practicability and success of the yeast process of the plaintiff is very strong. Such evidence has no weight in establishing patentable novelty, if the proof of anticipation and lack of invention is free from doubt (Republic Rubber Co. v. G. & J. Tire Co., 212 F. 170, 129 C. C. A. 26; Boston Pencil Pointer Co. v. Automatic Pencil Sharpener [C. C. A.] 276 F. 910; Slip Scarf Co. v. Wm. Filene's Co. [C. C. A.] 289 F. 641); but, where there is doubt as to the clearness and completeness of prior publications, the commercial success of the patent, especially in a crowded field, is taken as strong evidence that the matter disclosed was not obvious to the ordinary mechanic, or otherwise it would have been introduced in practice (Luminous Unit Co. v. Freeman-Sweet Co. [D. C.] 249 F. 876; Diamond Rubber Co. v. Consolidated Tire Co., 220 U. S. 428, 31 S. Ct. 444, 55 L. Ed. 527; Kurtz v. Belle Hat Lining Co. [C. C. A.] 280 F. 277; Eibel Process v. Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523; American Steel Co. v. Denning Wire [C. C.] 160 F. 108.

Such evidence may be fairly considered in the case at bar. When the processes of the patents in suit were introduced by the plaintiff in its business in 1919, the yield of yeast was increased from 35 per cent. to 65 per cent. of the material employed. In that year the volume of business of the plaintiff had reached the capacity of its plants, and new factories were in contemplation. When the process was changed, the new buildings became unnecessary, and, at the time of the trial, although the business had in the meantime increased 40 per cent., the factories of the plaintiff were running at only 60 per cent. of their capacity. Other advantages were also obtained. The period of production was shortened. With the grain mashes formerly used, the process required 48 hours to complete; under the present process, only 24 hours is required. There is a substantial saving in the cost of new materials by the substitution of molasses for grain. Molasses is more readily marketed; more easily stored and prepared for manufacture. Labor costs have been reduced. The quality of the yeast is improved. It is more uniform in character, of greater strength and durability. Notwithstanding the general increased cost of labor and materials since 1913, the price of bakers' yeast to the trade has increased only 7 per cent. Cereals have been released for other purposes, and the beet industry has been built up.

The defendant concedes considerable advantage to the present method of yeast manufacture, but counters with the suggestion that the benefits do not result merely from the process described in patents 103 and 127, but from the conjoint use of this process with those covered by other patents owned by the plaintiff. In the bill of complaint it is alleged that the plaintiff is the owner, not only of the patents 103 and 127, which were relied on at the time of trial, but also the Hayduck patent, 102, and the Wohl patent, 1,449,134, and that all of them have been used conjointly for the purpose of manufacturing yeast. In another suit in this court against another yeast manufacturer, the plaintiff alleged that it owns some eleven patents, including the four above mentioned and also Hayduck's patents, 1,449,105 and 1,449,106, that it is making use of them conjointly in the manufacture of yeast, and that their use has been profitable to the plaintiff, and a great benefit to the public. The defendant charges, therefore, that the great increase in the volume of the product and the improvement of quality and the savings described may not be ascribed to the two patents 103 and 127 alone. In the Hayduck patent 102 it is said that increased quantities of yeast are obtained by maintaining a very dilute nutrient solution, in accordance with the invention therein claimed, and in Hayduck patents, 105 and 106, a high yeast yield is said to be obtained at the expense of the production of

alcohol by starting the growth of the yeast in a very weak solution and thereafter adding concentrated wort slowly and continuously. In the Wohl patent, an advantage is claimed for the method of treating the molasses, whereby it is clarified in a fairly concentrated state, and heated to a relatively low temperature.

[5] Commercial success of a patented article is not persuasive evidence of invention as to a claim which covers only a part of the device or process, and, when it is shown that the claim in controversy does not cover the whole of the patented device or process, the weight of such evidence is very much reduced. Fielding v. Crouse-Hinds, 154 F. 377, 83 C. C. A. 331; De Mayo v. Michener Co., 231 F. 736, 146 C. C. A. 20; Am. Optical Co. v. Universal Co. (C. C. A.) 265 F. 925; Winton Co. v. Lindsay Co., 239 F. 521, 152 C. C. A. 399.

[6] The plaintiff did not describe all of the details of its yeast-making process in the course of trial. Objection was made to their disclosure on the ground that trade secrets would be unnecessarily revealed, and the objection was sustained. Before the case was closed, however, the defendant was offered an opportunity to go further into this matter, but, having put in evidence the additional patents referred to, professed itself content with the state of the record. The burden of proof to show that the patents in suit produced the beneficial results is of course upon the plaintiff; and the proof of commercial success is weakened in the absence of explanation of the part played by the remaining patents. Nevertheless the preponderance of the evidence favors the plaintiff. If any one matter has been emphasized above another by all parties in this case, it is the deleterious effect upon the growth of yeast of excessive acidity in the solution, and the corresponding benefit of neutralization. Confessedly, it is an important part of the completed process, without which the present yeast yields would not be obtained. Its efficacy the defendant company attests by adoption. The commercial success of the patent is proved, and supports the conclusion that the process was not obvious to those interested in the business until Hayduck disclosed it.

In considering the utility of the patented process in increased yields of yeast, attention should be given to a criticism leveled at a statement in the specification of patent 103. The superiority of the process over that outlined in patent 102 is declared. It is claimed that, when a neutralizer is used, yeast to the amount of 160 kilograms from a nutrient solution containing 100 kilograms of sugar may be obtained, whereas, under the process of patent 102, not more than 70 to 80 kilograms of yeast can be obtained from 100 kilograms of sugar. The defendant contrasts this statement with the illustrative formula set out in another part of the specification in which the amount of sugar and other ingredients are given. The experts agree that, from the ingredients prescribed by the formula, not more than 77 kilograms of yeast can be produced from 100 kilograms of sugar, even although neutralization by chalk is used. This follows because of the limited amount of nitrogen employed.

The defendant argues, therefore, that the patentee exaggerated the advantage of neutralization. But the patentee does not in terms declare that the greatest yield will follow from the use of the formula. On the contrary, the specification elsewhere suggests that an antacid substance may be used, which also contains nitrogen, as, for instance, aqua ammonia, and that molasses, which contains a substantial quantity of assimilable nitrogen, may be used to supply the sugar. Therefore when the whole specification is considered, it is clear that the yield of yeast obtainable should not be calculated solely upon the ingredients specified in the formula.

[7] No reference has so far been made to the presumption as to the validity of the patent arising from the fact that the patent was granted. It is familiar law that the grant of a patent is prima facie proof of novelty and patentability. W. W. Sly Mfg. Co. v. Pangborn Corp. (D. C.) 263 F. 394. The defendant contends that this presumption is not entitled to its usual weight in this case, by reason of certain references appearing in the file wrapper of patent 103. It is urged that the failure of the Patent Office to cite material references has greatly weakened, if it does not destroy, any prima facie presumption of validity. International Flatstub Co. v. Young & Selden Co. (C. C. A.) 284 F. 831. It is claimed that the Patent Office failed to examine, and the patentee to furnish for examination, Henneberg's article of 1908.

In the original specification, in the application for patent 103, it was stated that in the production of yeast, in accordance with the process, there takes place in solutions of sugar and mineral salts without any bacteria infection, a considerable increase in the acid content of the fermenting liquid; and

that the resultant acid, as has already been said by Henneberg, originates in the mineral salts used, whose basic parts are used by the yeast, while acid parts remain in the solution. This is the explanation of the acids produced in a nutrient solution when mineral salts are added which is contained in the Henneberg article of 1908. The examiner requested a more specific reference to the article, whereupon the applicant canceled the reference with the statement that no prior publication of Henneberg was known which served in any way as an anticipation of the invention.

It is suggested that a deliberate attempt was made to conceal the 1908 article from the examiner, for it does not appear in the record that this article was considered. Nevertheless it is true, as appears from the file wrapper, that the article of 1907, which treated at great length the question of acid in the production of yeast, and the use of lime salts or chalk to offset the injurious effect, was read by the examiner and discussed at length. As has already been pointed out, the article of 1908 added little to the disclosures of 1907, although it did make clear that the source of the acid was the splitting up of the mineral salts in the acid and mineral radicals. It does appear that the substance of Henneberg's researches was in the possession of the examiner, and the prima facie presumption from the grant of the patent is entitled to weight.

The finding is that patent 103 is valid, and since infringement of the claims, as discussed herein, is admitted, the plaintiff is entitled to the relief prayed.

Nilsson and Harrison Patent, 1,449,127.

The similarity of the process in this patent and the factory process of the defendant is striking. Indeed, with the possible exception of one item, the processes are identical. Both call for a nutrient solution of beet molasses and ammonium phosphate, and the addition of aqua ammonia to neutralize excess acidity. Some difference was claimed by the defendant as to the initial acidity of its solution. In other respects infringement is not denied.

Several defenses are urged to the patent. In the first place, it is contended that the patent is invalid for anticipation and lack of invention, for the same reasons as patent 103. Having considered these reasons in connection with patent 103, and found them insufficient, nothing further need be said in this respect.

In the second place, it is urged that patent 127 is invalid because it was issued to Harrison and Nilsson jointly, whereas it was devised by Harrison alone. This defense is based upon the fact that, while the application of Harrison and Nilsson for patent 127 was pending in the United States Patent Office, Harrison alone made application to the Canadian government and was granted a patent for the invention. The joint application of Harrison and Nilsson was made in the United States Patent Office on January 7, 1919, and the patent was issued on March 20, 1923. The application for the Canadian patent was filed on July 10, 1920, and the patent was granted on December 21, 1920. The petition of Harrison in the Canadian application contains the statement that he is the inventor of the process, and is supported by his oath in accordance with the requirements of the Canadian Patent Act that he believes that he is the inventor of the invention.

The Canadian act provides that a patent shall be invalid if in any respect the facts set forth in the petition are not true. The defendant contends that it is proved by the oath of Harrison, made subsequent to the joint application of Harrison and Nilsson for the United States patent, that Harrison was the sole inventor of the process, and that the United States patent was therefore void. But it appears that, subsequent to the grant of the Canadian patent, the Fleischman Company, as assignor of Harrison and Nilsson, petitioned the Commissioner of Patents for a reissue of the Canadian patent on the ground that, in the application, it was erroneously stated that the invention was the sole invention of Harrison instead of the joint invention of Harrison and Nilsson; that the Commissioner advised the applicant that he was without power to grant a reissue, and subsequently an act was passed by the Parliament of Canada and duly approved, reciting the above facts, and empowering the Commissioner of Patents to grant a reissue patent to the Fleischman Company upon its application, to be in full force and effect in the same manner as if the application for the original patent had been made by Harrison and Nilsson, instead of Harrison alone. This defense is therefore without merit.

[8] The third defense urged against patent 127 is of a more serious character. It is said to be invalid because it involves, in substance, the same subject-matter as patent 103. The history of the application of the two patents is important in this connection. The application for patent 127 was filed on January 7, 1919. The application

for patent 103 was filed on October 30, 1920, but it is nevertheless the prior application, for the reason that Hayduck, the patentee, applied for a corresponding German patent on March 15, 1915, which becomes the effective date in this country under the provisions of the Act of Congress of March 3, 1921 (41 Stat. 1313). The German patent was granted on October 24, 1919, and therefore it is not available as a prior printed publication when considering patent 127. Nor is the application for patent 103 available as a printed publication while withheld from the public as a pending application in the Patent Office, even although it be given the theoretical filing date of March 15, 1915. As between the copending applications in 127 and 103, the respective filing dates, in the absence of other evidence, fix the respective dates of invention. Hillard v. Fisher, 159 F. 439, 86 C. C. A. 469; Electric Co. v. Westinghouse, 171 F. 83, 96 C. C. A. 187; Twentieth Century v. Loew Co., 243 F. 373, 156 C. C. A. 153; Lemley v. Dobson-Evans, 243 F. 391, 156 C. C. A. 171. It is necessary, therefore, to determine whether patent 127 can be distinguished from patent 103 as a new invention.

The plaintiff contends that patent 103 is a primary or generic patent, whereas patent 127 may be distinguished therefrom as a subsidiary patent of limited scope, and, as so limited, constitutes a new and useful improvement upon the process described and claimed in patent 103. The typical claims pointed out by the plaintiff in patent 127 are claims 6, 8, and 2. The typical claims of patent 103 are said to be 8, 3, 2, and 1. The close similarity between the two may be readily perceived by a comparison of claim 2 in each patent:

"Patent 103. The process of manufacturing yeast which comprises preparing a yeast nutrient solution and propagating yeast therein with aeration, said yeast nutrient solution containing essentially sugar material and yeast-nourishing inorganic salts from which components are liberated which tend increasingly to acidify the nutrient solution during propagation, neutralizing the deleterious excess of such acidity by the addition of an innocuous antacid substance.

"Patent 127. A process of producing yeast, which comprises preparing a yeast nutrient solution, propagating yeast therein with aeration, said yeast nutrient solution containing only molasses and phosphate of ammonium adapted to be at least partially assimilated by the yeast and to set free components which tend increasingly to acidify the solution during propagation, and during the period of propagation, neutralizing the excess of such acidity."

It is obvious that the same two steps are to be found in each process, namely, the preparation of a yeast nutrient solution containing sugar material and inorganic salts, and, secondly, the neutralization of excess acidity developed during the process. The two patents are differentiated only by the fact, so far as the claims set out are concerned, that in patent 127 a particular inorganic salt is specified, to wit, phosphate of ammonium. The second step of neutralization is identical in claim 2 of both patents. In claims 6 and 8 of patent 127, the second step of neutralization is limited to the use of aqua ammonia as a neutralizing agent.

As already pointed out, there is no novelty in the production of yeast by the addition of inorganic salts in a yeast nutrient solution containing sugar material. It is also apparent that, by reason of the priority of patent 103, there is no novelty in the neutralization of excess acidity during the process. The question therefore is whether there was invention in the specification of a particular inorganic salt, to wit, phosphate of ammonium as an ingredient of the nutrient solution, and the specification of a particular antacid substance, to wit, aqua ammonia, as a neutralizing agent.

The application of patent 127, while prescribing particular substances in the claims, nevertheless in the specification states that other compounds containing phosphorus intended to be included in the practice of the invention are those of an inorganic character, adapted to yield at least a portion of their phosphoric content during the period of yeast propagation, as, for example, phosphorus acid, phosphoric acid, phosphate of ammonium, phosphates of alkali metals and phosphates of alkali earths, and that the compounds containing nitrogen are intended to include those which are adapted to supply inorganic nitrogen in yeast assimilable form; those preferably employed are ammoniacal compounds, as, for example, aqua ammonia, and salts of ammonium. Similarly, in regard to the step of neutralization, the specification states that certain alkaline compounds in this process are the equivalent of aqua ammonia when used with the addition of a suitable nitrogenous compound, and that, in the use of ammonium salts, it is preferable always to add an alkali, as, for example, a carbonate or a hydrate.

[9] In the specification of patent 103, there is reference to the fact that for neu-

tralization calcium carbonate may suitably be employed, but other basic or antacid substances, such as antacid substances containing or supplying nitrogen may also be employed for the neutralization, for example, ammonium carbonate, and, in that part of the specification in which the ingredients of a suitable yeast-nourishing solution are given by way of example, ammonium dihydrogenphosphate is included. Objection is made that the specification of patent 103 may not be referred to, but only the claims in order to ascertain the invention. This is in accordance with the decision of the recent case of Davis-Bournonville Co. v. Alexander Milburn Co. (C. C. A.) 1 F.(2d) 227, affirming the decision of the lower court in 297 F. 846, wherein the cases in the Sixth Circuit, holding the contrary rule, are cited and discussed, particularly Lemley v. Dobson-Evans Co., 243 F. 391, 156 C. C. A. 171. But in any event the specification of a patent may be read and construed with the claims, not for the purpose of expanding or limiting them, but for the purpose of ascertaining their true meaning and intent.

Making such use of the specifications of the patents, it is clear that the patentees of patent 127 recognized that certain other inorganic salts and certain other alkaline substances would serve as well as the specific nutritive and neutralizing substances designated in the claims of the patent, and that all of the substances are merely an equivalent of those disclosed by patent 103. No evidence was adduced at the trial to show that, in the employment of the substances designated in patent 127, any new function or result was produced. Under these circumstances, the following authorities justify a finding that there was no patentable invention in patent 127: Walker on Patents, § 36, p. 45; Smith v. Nichols, 21 Wall. 112, 22 L. Ed. 566; De Lamar v. De Lamar Min. Co., 117 F. 240, 54 C. C. A. 272; Ajax Metal Co. v. Brady Brass Co. (C. C.) 155 F. 409.

A decree will be signed in accordance with this opinion.