## STANDARD BRANDS, Inc., v. FEDERAL YEAST CORPORATION.

### No. 364.

District Court, D. Maryland.
Feb. 10, 1930.

F. P. Warfield, L. A. Watson, and C. V. Johnson, all of New York City, and Warfield & Watson, of New York City, for plaintiff.

Howson & Howson, of Philadelphia, Pa., for defendant.

SOPER, District Judge.

United States patent 1,449,103 to Hayduck, covering a process for making bakers' yeast, having been held valid and infringed in this court and on appeal [8 F.(2d) 186; (C. C. A.) 13 F.(2d) 570], Raymond S. Williams was appointed special master at the request of the parties to ascertain the prof-

its and damages payable by the defendant. Before the master's report was filed, a second suit by plaintiff against defendant was filed and heard upon three other patents involving yeast processes of the same inventor, to wit, United States patents 1,449,102, 1,-449,105, and 1,449,106, referred to hereafter as patents 102, 105, and 106, respectively. The opinion of this court in the second suit is filed simultaneously herewith. 38 F.(2d) 329. Standard Brands, Incorporated, has been substituted as plaintiff in both suits. After the master's report in the first case was filed, exceptions thereto came on to be heard; and, in view of the kindred subject-matter of the two cases, it was stipulated that the evidence before the master in the first case, and that before the court in the second, might be used interchangeably in either case.

The evidence before the master was voluminous. It related, not merely to questions of damages and profits, but also to questions of infringement of considerable difficulty and complexity, which have been handled by the master with painstaking care and skill in a lengthy report of 200 pages. It is summarized with some discussion of the important controverted questions in the following opinion:

The accounting period runs from March 20, 1923, on which date patent 103 was issued, to July 26, 1926. The evidence at the trial of the case in the District Court showed that the defendant was making use of a mash for the production of yeast, described as an all-molasses mash, which comprised beet molasses, ammonium phosphate, an inorganic salt, and aqua ammonia, a neutralizing agent. On September 10, 1923, the defendant had filed answers to certain interrogatories which showed that the only process of the defendant in which molasses was employed in whole or in part was the all-molasses process thus described. Shortly thereafter, however, to wit, in the month of October, 1923, the defendant began the use of a mash of a different kind, which has been referred to in the accounting proceedings as a mixed mash, consisting partly of molasses and partly of grain, in addition to inorganic ammonium salts and a neutralizing agent. Subsequently, to wit, on February 4, 1924, the defendant began the use of an all-grain mash without any molasses, together with inorganic ammonium salts and a neutralizing agent. During the accounting period the defendant made approximately 2,000,000 pounds of yeast by the all-molasses process, 1,650,000 pounds of yeast by the mixed grain process,

and 72,000 pounds of yeast by the all-grain process.

■ It thus appears that a considerable period elapsed between the adoption by the defendant of the mixed and the all-grain processes and the trial of the case before the District Court; but the employment of these two processes was not divulged at the trial. Consequently the attention of the court was limited to the all-molasses process, which was admitted by the defendant to infringe patent 103, and the controversy before the court was confined to the charge that the patent was invalid. Before the master, the defendant contended that patent 103 is limited in scope to mashes of raw or refined sugar or molasses, as sugar material, exclusive of grain, and that the mixed and all-grain mashes do not infringe. This was the first question which the master was called upon to decide. Although it was not a disputed point at the main trial, the court did give some consideration to the scope of the patent, as evidenced by the following quotation:

"It will be observed that patent 103 covers two main steps: (1) The employment of a nutrient solution containing essentially sugar material and yeast-nourishing inorganic salts; and (2) the neutralization of the excess of acidity during the period of propagation. As to the first step, it is clear that the claims of the patent are very broad. Molasses is mentioned in claims 12, 13, and 14, as a suitable source of sugar, and the specification, in its technical formula, includes salts of ammonium, phosphorus, potassium, calcium, and magnesium among inorganic salts to be used in the solution. It is clear, however, that the phrase 'essentially sugar material' is not confined to molasses, but includes raw and refined sugar, and other sugar-containing materials, and that the phrase 'yeast-nourishing inorganic salts' is comprehensive, and is not confined to the particular salts named." 8 F.(2d) 186, 189.

It is not necessary to decide whether, by reason of this decision, the question under discussion is res adjudicata. The master reached the conclusion that the scope of the patent is broad enough to include the mashes which have been described, and the court is of the opinion that this decision was correct for the reasons which will be now outlined.

Speaking broadly, the defendant's contentions are twofold: (1) That from the terms of patent 103, it is apparent that the inventor intended to limit the scope of the patent to mashes containing either sugar, as such, or molasses, and that the patent was granted by the Patent Office on this theory; (2) that there can be no infringement of the patent by mixed and all-grain mashes, because in the employment of this material, deleterious mineral acid is not created, and hence there is no occasion for the neutralization of excess mineral acidity during the period of propagation.

In order to sustain the first branch of its argument, defendant endeavored to show that the mash covered by patent 103 is the same as is contemplated in patent 102, that the latter mash is confined to raw or refined sugar, together with inorganic salts, and that the only difference between the patents is that patent 102 depends upon high dilution of the nutrient solution, whereas patent 103 depends upon neutralization to overcome the deleterious excess of acidity. The specification of patent 103 refers to the German patent 300,663, and the corresponding copending application in the United States Patent Office for patent 102, and declares that, in the production of yeast, in accordance with that process, there takes place in solutions of sugar and inorganic salts a considerable increase in the acid content. Specification 103 further declares, as its disclosure, that high yeast yields are obtained in the use of solutions containing sugar and mineral salts, in accordance with the process of patent 102, if the acid components set free are neutralized. From these expressions the defendant infers that Hayduck contemplated the same kind of wort in both patents, and then contends that in patent 102 Hayduck did not intend to cover cereal worts, but only such as contain raw or refined sugar, as such, as distinguished from the sugar from the saccharified starch of grain, supplying the deficiency of organic nitrogen by an addition of large amounts of inorganic ammonium salts.

In support of this argument, the defendant points out certain statements in the specification of patent 102 wherein Hayduck seemed to draw a contrast between the known practice of adding inorganic salts to cereal worts, on the one hand, and his discovery on the other that yeast might be made from raw or refined sugar; all other nourishment being of a purely inorganic character. Thus he said that it was well known that inorganic salts might be added to the usual cereal worts for the better nourishment of the yeast, that yeast had been made in the laboratory from solutions which contained, besides sugar, only inorganic salts as nutriment, and that it had also been proposed to make yeast industrially from waste sulphite liquor (obtained in the manufacture of cellulose), with an addi-

tion of inorganic salts as shown by the United States patent to Willcox No. 1,044,615. Moreover, Hayduck confined his illustrative examples in patent 102 to raw or refined sugar as sources of sugar material. The claim of the German patent, corresponding to patent 102, is restricted to a process of yeast manufacture "by the use of sugar and purely mineral nutritive salts." In short, the defendant contends that Hayduck intended by patent 102 to disclose that it was possible to vary the known processes which involved the use of grain as sources of both sugar and nitrogen, and to substitute therefor a mash in which sugar as such was used as an ingredient, while other necessary ingredients, nitrogen, phosphorus, etc., were supplied entirely from inorganic salts.

On the other hand, it is the plaintiff's opinion that patent 102 is not so restricted. The references in the specification to solutions consisting only of sugar and inorganic salts are said to represent the extreme case which tests the efficiency of the invention, and the patentee intended to say that, having solved this major difficulty, it was obvious that his process would work under the less severe conditions of a mash consisting partly of sugar and partly of grain. Sugar was not the only substance in addition to salts mentioned in the patent. Raw sugar was expressly specified, and this substance contains at least 15 per cent. of molasses. Furthermore, claim 3 of the patent expressly declared that the yeast nutrient solution should be exclusive of cereal material, and, since this excepting clause was omitted from the other claims, it is fair to infer that cereal material was included therein. All of the claims used the expression "essentially sugar material," and there would seem to be no explanation for the use of this phrase if the patentee intended to restrict himself to the use of sugar alone. The reference to waste sulphite liquor and its sugar content was also significant because it is obvious that the patentee in this instance intended to cover a substance which was not solely sugar. The Willcox process never went into practical use, and it is difficult to understand, if Hayduck intended in patent 102 to cover a process of this sort, why he would not have intended also to cover well-known mashes in the yeast industry in which cereals were commonly employed.

These considerations were also urged by the parties in discussing the scope and validity of patent 102 in the second case, but it was not necessary to decide the issue, because the plaintiff failed to show that the defendant had infringed the patent. It is not necessary to decide it now. It is sufficient to say that, when the references to patent 102 in patent 103 are considered in connection with other parts of the specification of patent 103, it becomes clear that Hayduck did not intend in the latter patent unnecessarily to restrict the scope of his claims. Thus he stated in the specification and in certain claims of patent 103 that molasses, as distinguished from raw or refined sugar, might be used as a suitable source of sugar, and, if so used, the quantity of neutralizer in the mash might be reduced because molasses contains naturally certain antacid substances which would neutralize a part of the acid set free. These antacid substances have been described in the second case between the parties as buffering material, and the experts agree that they are also found in substantial quantities in the cereal components of a grain mash. There is a strong similarity between molasses and grain in this respect. There are other similarities. Both kinds of material contain large quantities of sugar or sugar material, and substantial quantities of nitrogen. Molasses contains not only 50 per cent. of sugar, but approximately 2 per cent. of nitrogenous material. It cannot be supposed that Hayduck was ignorant of these elementary facts in regard to the material which had been used for a long time in yeast manufacture. Therefore the prescription of molasses is strong evidence that Hayduck did not intend that the phrase "essentially sugar material" should have a narrow construction. He expressly specified that it should include a material which, like cereals, contains, in addition to sugar, other ingredients necessary for the growth of yeast.

There is other explicit evidence in the specification that Hayduck had in mind, as does every patentee, that his claims should be made as broad as his disclosure warranted. He said, in referring to his illustrative examples in the specification:

"While in the foregoing description I have given a detailed embodiment of my present invention, it will, of course, be apparent that the invention is not limited to the use of the particular substances employed as yeast nutrients, but that my present invention is merely typified and illustrated by the example given and includes broadly all such processes as come within the scope of the claims hereinafter presented, bearing in mind the fact that substances such as fermentable sugars, added as such or in the form of molasses, and suitable yeast-nutrient salts as typified by those in the example given will

be used, in accordance with my process and claims, in such aggregate quantities and in such proportions as are requisite for supplying in the proper proportions and in yeast assimilable form or combination the necessary carbon, nitrogen, phosphorus and other essential yeast-constituent elements for the production of yeast in such quantities as are desired and preferably in the high yield hereinabove indicated as obtainable by the process of my present invention when carried out with suitable aeration of the nutrient solution during the yeast production."

The defendant picks out of this quotation the reference to "fermentable sugars, added as such or in the form of molasses," and infers that the patentee confines himself to these articles in making up his mash. Cereals do not contain fermentable sugars inherently. Sugar material is present in them in the form of a starch which must be saccharified in a treatment which precedes the propagating period. Hence the defendant contends that the phrase "fermentable sugars" is not consistent with the use of grains. This is not altogether clear, because the sugar material in grain, although not fermentable inherently, becomes so before it is placed in the propagating vat, and, if this fact be borne in mind, there is room for the argument that the patentee had cereal grains in mind when he used the phrase "fermentable sugars." However this may be, it is obvious that, in the passage quoted, the patentee endeavored to cover the field as broadly as possible, but at the same time admonished the yeast maker to be careful to supply to the growing yeast carbon, nitrogen, phosphorus, and other essential yeast constituent elements in the requisite proportions when the fermentable sugars and yeast nutrient salts are employed.

█ The defendant also urges that the scope of patent 103 is necessarily limited by the United States patent to Wohl, No. 1,475,215. This patent also belongs to the plaintiff, and it would seem to follow from defendant's argument, although the circumstance is hardly material, that the defendant would infringe the Wohl patent if not patent 103. The application for the Wohl patent was copending with patent 103 both in Germany and in the United States. In its original state, it was filed before the Hayduck patent; but that part of the patent which is most significant in relation to the present discussion was inserted subsequent to the Hayduck application. Wohl announced that he had discovered that yeast might be produced from a nutrient solution, containing essentially sugar material and other yeast nutrients, including cereal material and inorganic nitrogen compounds. He proposed to use a wort in which the organic nitrogen, contained in the cereal material, was present in an appreciably lesser degree than in the usual cereal wort, and to supply the missing nitrogen in the form of inorganic compounds. In some of his examples he used exclusively grain material and in others a mixed mash of sugar and grain material, in each case supplying a portion of the nitrogenous material, amounting from 10 to 50 per cent. in the form of yeast assimilable ammoniacal nitrogen. After the Hayduck patent had been filed, Wohl amended his specification and claims to call for the use of neutralization where not only a material part of the organic nitrogen was omitted, but a considerable portion of the cereals was replaced by sugar. Wohl did not seem to know that increased yields might be expected from the use of inorganic salts, but confined his discovery to the substitution of inorganic for organic nitrogen, the advantage being in cheapening the process.

Since the neutralization step in Wohl was not inserted until after the filing of the Hayduck patent, the Wohl patent does not tend to invalidate patent 103. Indeed it was not cited for this purpose in the main trial of patent 103; but it is now suggested that, since the Patent Office had both of these patents before it, they must be construed and limited with reference to each other, the Hayduck patent being restricted to mashes consisting of sugar and molasses, plus inorganic salts, and the Wohl patent to all grain and mixed mashes with inorganic salts. It is obvious that, so far as neutralization, the gist of the Hayduck patent, is concerned, there is no necessity for such a restriction upon it because the Hayduck disclosure was prior to that of Wohl. It is also apparent from the foregoing discussion that Hayduck did not intend so to restrict his claims. The mere fact that the Patent Office may have granted both patents may tend to show that the Wohl patent is invalid in so far as it incorporates matter covered by the prior disclosure of Hayduck, but it does not follow that the Hayduck patent is restricted or limited by the Wohl grant. A somewhat similar situation arose in the main trial as to the Harrison and Nilsson patent, when it was seen that the patent pertained only to a part of the field already completely held by patent 103. (C. C. A.) 13 F.(2d) 570; (D. C.) 8 F.(2d) 186, 200. But it is not necessary in this case, in

which the validity of the Wohl patent has not been attacked, to pass thereon. It is sufficient to decide that the grant of the Wohl patent does not restrict patent 103 as defendant contends.

The court does not find any good reason for restricting the Hayduck process to worts which contain only sugar or molasses as sugar material. A meritorious patent, which has been attended by benefits of great practical advantage in the practice of the art ought not to be narrowly construed. The opinion of this court on the main trial, 8 F.(2d) 188, shows that the change in yeast manufacture due to the introduction of the Hayduck process was described by witnesses as revolutionary. It increased the yield of yeast from 35 to 65 per cent. of the material employed. 8 F.(2d) 198. It is true that much of the saving in cost of production was due to the substitution of molasses for grain; but the patentee showed how the deficiency of molasses in yeast nutrient material might be made up by the addition of inorganic salts without deleterious effects upon the wort. The defendant cannot avoid the infringement of this discovery by using in place of molasses, in whole or in part, cereal grains which contain equivalent yeast food if the same problem of deleterious acidity arises and is overcome in the manner taught by Hayduck. The fact that the process is more expensive when grain is used is no answer to the charge of infringement. Infringement in an unskillful manner is nevertheless infringement. Gibbs v. Triumph Trap Co. (C. C. A.) 26 F. (2d) 312.

This conclusion brings us to the second and main contention of the defendant that there is no infringement in the use of mixed or all-grain mashes because they contain certain so-called buffering material whereby deleterious acidity is obviated. In the last analysis, this assertion is the basis for defendant's argument that the scope of patent 103 should be restricted to the all-molasses wort. The theory is that Hayduck himself appreciated that in grain worts no mineral acidity was present, and hence his discovery was necessarily limited to the kinds of wort illustrated by the example of the patent. The defendant rests its case on the assertion that the same chemical problem does not arise in both cases, and does not seriously deny infringement, if in fact the reactions of the all-molasses mash are chemically the same as those of the mixed and all-grain mashes. This question was raised for

the first time in the accounting proceedings before the master; but it first came to the attention of the court in the second case when infringement of patent 106 was under consideration. The problem is the same in that patent as in patent 103. It was exhaustively considered by the parties, through their experts and counsel, and the findings of the court are set out in its opinion. Some reference has been made therein to the testimony before the master. The court found that the buffering material in the defendant's mashes was not sufficient to overcome the harmful acidity, basing its conclusion in large part upon the fact that the defendant, notwithstanding its belief in the efficacy of the buffering material, took pains in all its mashes, where inorganic salts were present, to accompany them with a neutralizing substance. The conclusion of the master was that the defendant infringed patent 103 by all of the mashes in question, and in this conclusion the court concurs.

### The Measure of Damages.

The evidence in this case shows beyond doubt, and the parties concede, that the defendant made no profit out of its infringing operations, but, on the contrary, conducted its business at a loss. Consequently, as the master correctly held, there was no basis for a decree for profits to be accounted for by the defendant under Rev. St. 4921, as amended, USCA, tit. 35, § 70. It is contended, however, by the plaintiff that, under the evidence in the case, it is entitled to recover as actual or specific damages the profits which it would have earned if it had sold all of the yeast which the defendant sold in its infringing operations. The master held that, while the evidence tended to show that the plaintiff lost some business and some resulting profits through the defendant's infringing sales, the extent or amount of the sales was not definitely shown, and hence the plaintiff could not recover such specific damages, but should be compensated in damages measured by a reasonable royalty for the use by the defendant of the plaintiff's patent. To this finding of the master, the plaintiff excepted contending that by the great weight of the evidence, it had established that it could and would have sold all or practically all of the infringing yeast manufactured and sold by the defendant, had it not been for defendant's illegal competition. This exception will now be considered in the light of the testimony.

The accounting period runs from March 20, 1923, to July 26, 1926. During all of this period and for a long time prior thereto, as shown by the opinion of this court on the main trial, 8 F.(2d) 186, 189, the Fleischmann Company conducted a business of great size and dominated the yeast industry in the United States. It has been estimated that it manufactured not less than 90 per cent. of the yeast consumed in this country, and that its assets at the time of the main trial amounted to $35,000,000, including eleven manufacturing plants in various parts of the United States. It had distributing stations throughout the United States, including all of the points where the defendant sold its product. The Federal Yeast Corporation was formed in the year 1921. It had a paid-in capital of $329,700. Its only factory was at Baltimore; and its distributing stations were located in Baltimore, Philadelphia, Newark, Long Island City, Boston, Cleveland, and Detroit. It also made large sales to a distributor of yeast in Montreal. Defendant's sales were principally made to small bakers, although in a few cases more important customers were obtained.

The parties to the cause did not have the field to themselves. There were other competing yeast manufacturers, of which the Liberty Yeast Corporation was the most important. It was active throughout the territory jointly occupied by the Fleischmann and Federal Companies, as well as elsewhere. The Liberty Company was a much larger concern than the Federal Yeast Corporation, and did about five times as much business. In 1924 it did a business of from 10,000,000 to 12,000,000 pounds, with gross receipts of $2,227,000. It began business in the West in the fall of 1919, extended thence towards the Atlantic Coast, and became established in the East before the Federal Company was incorporated.

The product of the Fleischmann Company was so well and so favorably known, and its influence on the market so powerful, that its competitors found it necessary to sell their product at a considerably lower figure, which was substantially the same for all the smaller factories. Thus the Philadelphia manager of the Federal Company, with supervision over the metropolitan district of Philadelphia, testified that, between the spring of 1923 and the middle of 1926, the Fleischmann prices ran from 25 to 28 cents a pound while the Federal and Liberty prices ran from 18 to 22 cents a pound. The difference in selling price

was not always and everywhere so great, especially with the larger customers, but the lower prices of the smaller yeast manufacturers were an important and influential factor.

In order to prove its contention, the Fleischmann Company offered evidence particularly directed to New York, Newark, and Philadelphia, tending to show that in this territory the principal customers of the defendant had purchased their requirements of yeast from the plaintiff before the defendant entered the field, and returned to the plaintiff either before or shortly after the termination of the accounting proceedings. The names of certain of the defendant's customers in Chicago and Montreal were also mentioned, but none of the defendant's customers in Baltimore, Boston, Cleveland, or Detroit were given in the evidence, nor was there any testimony in detail as to the competitive conditions in these cities other than the showing that, in all of these places, both the Liberty and Federal Company were competitors of the Fleischmann Company.

The Liberty Yeast Corporation was also an infringer of the plaintiff's patent. It was actively engaged throughout most of the accounting period and until it was acquired by the Fleischmann Company in October, 1925. It is estimated that the Liberty Company did about 2 per cent. of the total amount of business in the Eastern territory, and there was testimony tending to show that, when its assets were purchased by the plaintiff, the latter was able to hold about 85 per cent. of the Liberty's business in the Brooklyn district, about 79 per cent. in the Newark district and about 84 per cent. in the Philadelphia district. On the other hand, defendant's Philadelphia manager testified that, when the Liberty Company was bought by the plaintiff, the defendant's business in that city increased 75 per cent.

After a careful consideration of all of the testimony relating to yeast sales and competition by yeast manufacturers, the special master reached the following conclusions of fact:

"1. During the period in question, the plaintiff had in Brooklyn competition from Liberty, Federal and Bakers & Consumers; and in Newark from Liberty and Federal; in the Philadelphia district the plaintiff had competition from Liberty, Federal, Red Star and Keystone. In the Chicago district from Liberty, Federal, Red Star, Callahan and several other concerns. Plaintiff had competition in Baltimore, Boston, Cleveland and Detroit, though the evidence on this point was

general and not of a specific character as in the cases of New York and Philadelphia.

"2. Dugan Bros. both in Brooklyn and in Newark had been customers of Liberty before they were customers of Federal, and consequently all of its business had not been Fleischmann's before Federal entered the field.

"The American Stores and the Parkway Bakery in Philadelphia were both customers of Liberty before Federal entered the field, and consequently Fleischmann had not supplied them with all of their requirements before the advent of Federal.

"3. In the New York and Philadelphia districts, Liberty and Federal sold at prices lower than Fleischmann."

Briefly stated, the position of the plaintiff is that, since the testimony showed that a considerable number of the principal customers of the defendant were, before the defendant entered the business, customers of the plaintiff and returned to it in later years during or after the conclusion of the litigation which established the validity of the Hayduck patent, and since the testimony also shows the preponderating influence in the yeast-making field of the Fleischmann Company and its ability to hold a large percentage of the customers of the Liberty Company when the latter was purchased, it is only reasonable to assume that, if the Federal Company had not been in the field, practically all of its product would have been made and sold by the plaintiff, and therefore plaintiff should be allowed as specific damages either all or a very large part of the profits which the plaintiff would have earned but for the defendant's unlawful acts. It is admitted that the plaintiff would not have had the field to itself, even if defendant had been eliminated, because there would still have been the Liberty Yeast Corporation. But it is argued that the probability that it would have done a substantial part of the business performed by the Federal Yeast Company, if the latter had not been operating, should not be considered, because a court of equity will not presume that customers will purchase a patented article from an infringer when the patentee is in business and able to supply all demands.

To sustain this argument, the plaintiff relies on United States Frumentum Co. v. Lauhoff (C. C. A.) 216 F. 610, 614, wherein recovery of specific damages was denied because the plaintiff had failed to show that it would have made the sales in question if the defendant had not made them. The court said: "There was no testimony that defendants' customers had formerly bought from plaintiff, nor that they were in negotiation with plaintiff or in a territory in which plaintiff was selling, nor of others of those circumstances sometimes held sufficient and sometimes held insufficient to raise the presumption that plaintiff would have made the sales."

Having offered some proof that the defendant had interfered with its customers, the plaintiff contends that it has fulfilled the requirements of the rule. But the court went on to say: "This presumption is not one of law. Dobson v. Dornan, 118 U. S. 10, 17, 6 S. Ct. 946, 30 L. Ed. 63; McSherry v. Dowagiac (C. C. A. 6) 160 F. 948, 89 C. C. A. 26. If it exists, it must be raised by the proofs as one of fact. No doubt this presumption may sometimes follow from the mere fact that some one buys or uses the infringing article, as in the cases of which Goulds Mfg. Co. v. Cowing, 105 U. S. 253, 26 L. Ed. 987, is typical; but in that case, and in those cases generally, the infringing article was a special piece of apparatus, and it did not appear that anything else accomplishing the same purpose or generally similar was on the market."

Again the plaintiff relies upon Regina Music Box Co. v. F. G. Otto & Sons (C. C.) 114 F. 505, 508, and upon Transit Dev. Co. v. Cheatham E. S. Device Co. (C. C. A.) 194 F. 963, 965, to show that there is a natural inference that customers would prefer to buy from one authorized to make or sell the desired merchandise rather than from one engaged in unlawful and infringing manufacture or sale. This presumption was held sufficient in Regina Music Box Co. v. F. G. Otto & Sons, supra, to support the conclusion of a court of equity that damages should be allowed to the plaintiff for the making and selling by the defendant of a patented music box of which the patentee was the only other manufacturer; and in Transit Dev. Co. v. Cheatham E. S. Device Co., supra, to justify the verdict of a jury against the infringers of a patent covering an electrically controlled railway switch. The report does not show whether there was competition in this case.

The master held that, under the circumstances of the pending case, these authorities did not sustain the plaintiff's theory, and this conclusion seems to the court to be correct. It is well settled that the burden of proof is upon the owner of the patent in a suit for infringement to show, not only that

he could have supplied the demand of the trade, but that, except for the infringement, he would have made the sales made by the defendant. Proof in such a case cannot of course reach the point of absolute certainty and the natural tendency of the trade to deal with the lawful manufacturer or seller may be relied on, especially where the patent covers an article of a distinctive kind, or the plaintiff and defendant have the field to themselves. But where the article can be had from a number of manufacturers, who are in active competition with the plaintiff, the presumption is of little aid, and the plaintiff must show, by reasonably definite evidence, not only that it has lost some business, but the amount of the business which the infringer has taken away. Otherwise the court is left only to speculation and conjecture as to the amount of damages to be assessed. McSherry Mfg. Co. v. Dowagiac Mfg. Co. (C. C. A.) 160 F. 948; Force v. Sawyer-Boss Mfg. Co. (C. C. A.) 143 F. 894; Woods v. McCord & Co. (C. C. A.) 14 F.(2d) 943; Motor Player Corp. v. Piano Motors Corp. (D. C.) 19 F.(2d) 993; United States Frumentum Co. v. Lauhoff (C. C. A.) 216 F. 610; Yesbera v. Hardesty Mfg. Co. (C. C. A.) 166 F. 120; Bemis Car-Box Co. v. J. C. Brill Co. (C. C. A.) 200 F. 749; Seymour v. McCormick, 16 How. 480, 14 L. Ed. 1024; Dobson v. Dornan, 118 U. S. 10, 6 S. Ct. 946, 30 L. Ed. 63.

Applying these principles to the facts of the pending case, the master held that it was impossible to determine from the evidence what was the amount of the business which the defendant diverted from the plaintiff. He described the situation as follows:

"The demand was for yeast and not for the specific patented article. There was competition throughout the field and in certain places additional competition to that of defendant and Liberty. The last two competitors sold at prices lower than the plaintiff. Specific evidence of conditions in quite a number of places where the defendant sold was not produced, nor was it shown what proportion of the defendant's total sales should be allocated to each of the districts where it and the plaintiff were doing business.

"As stated in Motor Player Corporation v. Piano Motor Corporation, supra: 'We may readily conclude that the plaintiff lost sales through the defendant's infringement. But this alone is not sufficient reason for awarding specific damages. The pertinent question is, how many?' "

This conclusion seems to the court to be correct, and hence the exception of the plaintiff must be overruled.

### Reasonable Royalty.

It is now well settled that, in the absence of an exact method of computation showing the losses which a patentee has suffered from infringement, damages may be ascertained on the basis of a reasonable royalty. This convenient designation has been used to express the general damage suffered by the patentee through the wrongful appropriation of the exclusive property right conferred by the patent. Since there is a tortious taking of a part of this property, the normal measure of damages is the value of what was taken, and this may sometimes be fixed at what the right to use the patent may bring in the open market. Hence if the patent owner has customarily granted licenses to others, the established royalty constitutes a strong indication of the value of what was wrongfully taken and affords a basis for measuring the damages. But if, as in the case at bar, the patent has been kept as a close monopoly and there is no established royalty —in other words, no market value of the property taken—damages cannot be ascertained with mathematical accuracy but only by a reasonable approximation. Courts have held that in such a case it is permissible to show the value by considering the nature of the invention, the extent of its use, and its commercial utility and advantages as evidenced by the profits and savings which attend it. The testimony of experts and persons informed by observation and experience may be received. The evidence may also include the actual experience of the patentee and other users of the patented device. The damage is customarily expressed in the form of a fixed sum for each article sold in such amount as in the opinion of the court, under all of the circumstances, will constitute a reasonable royalty or license fee for the use by the infringer of the plaintiff's property. Dowagiac Mfg. Co. v. Minnesota Plow Co., 235 U. S. 641, 35 S. Ct. 221, 59 L. Ed. 398; United States Frumentum Co. v. Lauhoff (C. C. A.) 216 F. 610.

A number of the cases suggest that, in reaching this result, it is necessary to make allowance for a reasonable profit to be earned by the licensee, since it is inconceivable that licenses would be bought or sold at such a price as to prevent the realization of a reasonable profit. Thus it is said that the purpose in view in any particular case is to determine what amount a person desiring to

manufacture or sell the patented article could fairly pay as a royalty and yet make or sell it on the market at a reasonable profit to himself. Austin-Western Rd. Mchy. Co. v. Disc G. & P. Co. (C. C. A.) 291 F. 301; Merrell Soule Co. v. Powdered Milk Co. (C. C. A.) 7 F.(2d) 297; Mecky v. Garton Toy Co. (D. C.) 277 F. 507; Consolidated Rubber Tire Co. v. Diamond Rubber Co. (D. C.) 226 F. 456; K. W. Ignition Co. v. Temco (C. C. A.) 283 F. 873.

The master in the case at bar, having found it impossible to ascertain by more precise methods the damages suffered by the plaintiff, applied the theory of reasonable royalty to the evidence adduced before him. The testimony tended to show the savings which a manufacturer might be expected to make from the use of the all-molasses process under the patent in suit as compared with the all-grain process, which was in common use by the plaintiff and other manufacturers before the patented process was adopted. The evidence also related to the reasonable expectation of profit to be made by manufacturers employing the patented process. The master weighed the testimony from both angles and with particular reference to the experience of the parties to the case and of the Liberty Yeast Corporation. It will be necessary only to summarize the result of his work:

Considering first the benefits to be obtained from the Hayduck disclosure in the manufacture of yeast, there seems to be little doubt that a substantial saving does result from the patented process. When the main case was on trial, evidence of the commercial practicability and success of the process was considered as throwing light on the question of invention, and the following comment was made by the court, 8 F.(2d) 186, 198:

"Such evidence may be fairly considered in the case at bar. When the processes of the patents in suit were introduced by the plaintiff in its business in 1919, the yield of yeast was increased from 35 per cent. to 65 per cent. of the material employed. In that year the volume of business of the plaintiff had reached the capacity of its plants, and new factories were in contemplation. When the process was changed, the new buildings became unnecessary, and, at the time of the trial, although the business had in the meantime increased 40 per cent., the factories of the plaintiff were running at only 60 per cent. of their capacity. Other advantages were also obtained. The period of production was shortened. With the grain mashes

formerly used, the process required 48 hours to complete; under the present process, only 24 hours is required. There is a substantial saving in the cost of new materials by the substitution of molasses for grain. Molasses is more readily marketed; more easily stored and prepared for manufacture. Labor costs have been reduced. The quality of the yeast is improved. It is more uniform in character, of greater strength and durability. Notwithstanding the general increased cost of labor and materials since 1913, the price of bakers' yeast to the trade has increased only 7 per cent. Cereals have been released for other purposes, and the beet industry has been built up."

The court concluded, upon the evidence before it, that, although other patents were used by the plaintiff in its manufacture of yeast, the commercial success of the patent had been proved, and ascribed the advantages of the plaintiff's process in large part to the merits of patent 103.

In further elaboration of the same matter in the accounting proceedings, plaintiff's accountants estimated that specific savings, due to the patent, included $100,000 a year on fuel; from $200,000 to $300,000 per year in express or shipping charge, due to the superior keeping quality of the yeast, and, in addition, a reduction of 40 per cent. in labor costs. From the books of the company, the costs of labor and material for grain yeast as made in 1915 and 1916 as compared with molasses yeast made under the patent from 1920 to 1926 were given. These figures were converted into cents per pound, and the conclusion was reached that the total savings amounted to 3.5277 cents per pound. It was, however, brought out that, beginning with the year 1924, the plaintiff employed not merely the process covered by patent 103, but added thereto the improvement or changes covered by patents 105 and 106, and by the conjoint use of the three patents the savings of the company were substantially increased. In order to ascertain how much of these savings should be attributed to the use of process 103 alone, additional evidence was taken to show the cost of yeast making during the years 1920 to 1923, before patents 105 and 106 were used, and the conclusion was reached from this calculation that the change from grain to molasses yeast under patent 103 was attended by savings covering the period in question of the average sum of 2.923 cents per pound.

The plaintiff also produced statements prepared by the defendant showing its experience in the manufacture of yeast from

grain and also from molasses mashes under the patent. The figures first submitted to the master in 1927, covering the period from March 20, 1923, to July 26, 1926, indicated that there was a difference of 2½ to 3 cents per pound in favor of the all-molasses mash as compared with the all-grain mash. Subsequently on May 21, 1929, a corrected statement was filed by the defendant crediting all the returns of certain by-products of grain yeast to that kind of a mash. In the earlier statements these returns had been erroneously credited in part to the all-molasses mash. The latter figures showed that in 1923 the cost of the all-molasses process exceeded that of the all-grain process by 2.29 cents per pound, whereas in 1924 the cost of the all-grain process without neutralization exceeded that under the patent by 1.32 cents per pound. The master accepted the last-named figure as some evidence that even in the small business of the defendant the all-molasses process was found to be less expensive.

It is obvious, however, that the value of the process was not clearly demonstrated in the defendant's factory. The business was relatively small. The experience of the company was short, and the operations of the company, by reason of the small output of the factory, or inefficiency of management, were conducted throughout the period at a heavy loss. Not much weight can be given to the experience of a manufacturer who lost money in an industry in which others were profitably engaged. It will also appear hereafter that the defendant was not solely interested in the production of yeast in its factory, and did not always utilize the yeast-making process to the best advantage.

Other testimony bearing upon the profits (as distinguished from savings) to be made in the industry as shown by the experience of the Fleischmann and Liberty Companies will be hereafter discussed. It is desirable at this point to take up the criticisms leveled by the defendant at the probative force of the plaintiff's testimony already referred to, for it is obvious that, if the evidence shows a definite saving of 2.923 cents per pound, there is at hand a very satisfactory measure of damages which approaches mathematical certainty. Such a saving would seem to be quite as exact a measure of damages as the loss of profits by the plaintiff on a definite number of sales of which the plaintiff was deprived by the defendant's infringement. Indeed the importance of basing a calculation of damages upon the saving to be expected from a patented process is emphasized by authorities which indicate that it is only when the court cannot find with any degree of satisfactory accuracy what damages were sustained through plaintiff's loss of profits, or what savings were realized by defendant's use of the invention, that resort is had to the doctrine of reasonable royalty. National Tube Co. v. Mark (C. C. A.) 10 F.(2d) 430, 432. "What evidence could be more appropriate and pertinent than that of the utility and advantage of the invention over the old modes or devices that had been used for working out similar results?" Suffolk Co. v. Hayden, 70 U. S. (3 Wall.) 315, 320, 18 L. Ed. 76.

The defendant contends, in the first place, that the figures offered by the plaintiff's witnesses are inaccurate or incomplete. It asserts that the plaintiff's comparison of costs is not convincing because its experience in 1915 with the all-grain process was contrasted with the actual figures for the years 1920 to 1923 for the all-molasses process. The fact is, however, that the figures for 1915 were used only in regard to the cost of grain materials in that year. This cost figure was selected by plaintiff's accountants rather then the cost of grain during the susbequent war period, which was abnormally high. Obviously it was to the advantage of the defendant that the lower figures for grain in the year 1915 should be employed in a calculation, the purpose of which was to show that the cost of the grain process exceeded that of the all-molasses process.

Next, the defendant complains that the plaintiff's witnesses took no account of the by products, namely, alcohol and spent grain which result from the all-grain process, but are absent when molasses is used. It is contended that, by reason of this omission, the figure 2.923 cents per pound is inaccurate and cannot be accepted as a basis of damages. This point was not raised while the plaintiff's accountants were on the witness stand, and seems to have been broached for the first time in the argument and brief of defendant's counsel, who now endeavor to make the point by referring to the testimony of the plaintiff's accountant on the main trial, and to certain experience in the defendant's factory which was related during the master's hearing. The testimony in the main trial, which took place in October, 1924, clearly shows that one of the problems of manufacturers of yeast was to reduce the amount of alcohol which was necessarily produced in the process. One of the advantages of the new process under the patent is that it is possible to regulate the amount of alcohol made therein, and to eliminate it altogether

if desired, whereas under prior methods a certain amount of alcohol was always found, although in diminishing quantities as processes were improved from year to year. There is also some value in the wet grains which remain from the process which may be sold as food to cattle.

It seems, therefore, to be clear that, in ascertaining the material costs in an all-grain process, the returns from the by-products should be considered; but there is nothing in the testimony of plaintiff's accountants before the master to show that they were not considered in the calculation. The figures of the witnesses were taken from the detailed cost record and accounts of the Fleischmann Company which were assembled in the central office from the various manufacturing plants. There is every reason to believe that, in a business of this extent, the work was accurately done and the savings from the sale of by-products carefully considered. Indeed the testimony indicates that the matter was in the minds of plaintiff's witnesses because, in the course of their examination, they criticized certain accounts of the defendant which failed to show the proceeds of by-products in the calculation of material costs. In the absence of any cross-examination of plaintiff's accountants as to whether this point was considered by them in making their calculation, it is only fair to assume that this important detail was not omitted.

Nor does the testimony of defendant's accountants as to the experience in the defendant's factory support the defendant's contention. We have already seen that the defendant submitted to the master corrected accounts whereby there was a reapportionment of the proceeds of the sale of by-products, crediting all of them to the all-grain process. The by-products designated in the account were alcohol and wet grains, of which it would appear that the alcohol was the more important. The corrections covered only the years 1923 and 1924, and tended to demonstrate that it cost the defendant more to manufacture yeast from molasses than from grain. But, while the attending circumstances were examined, it was disclosed that a fair test of the all-molasses process was not had. The defendant produced not only yeast, but also vinegar, and for the latter product a certain amount of alcohol was necessary. Consequently the manufacture of yeast was so conducted as to produce the alcohol desired, and the amount of yeast was necessarily diminished. Furthermore, the accounts do not make clear that the alcohol was sold at its true value to the vinegar department of the defendant's business. It was priced at such a figure in the interdepartmental transfer as would allow the vinegar to be sold at the market price. The vinegar factory burned down in the year 1925, and thereafter the defendant's accountant failed to take the value of the by-products into account. It would appear that, after the fire, the defendant got no returns from the alcohol produced, and that the proceeds from the spent grains were so insignificant that the accountant did not think it worth while to take them into consideration in ascertaining the cost price of the all-grain process. It seems obvious that the defendant's experience with by-products from all-grain yeast furnishes little support to its position.

In the third place, the defendant challenges the figures of the plaintiff on the ground that they cannot be considered typical of what the average yeast manufacturer might expect. The production of 100,000,000 pounds of yeast annually by the plaintiff may be compared with the production of less than 1,000,000 pounds of yeast by the defendant or with the amount produced by the Liberty Yeast Corporation, estimated by plaintiff's witnesses to be 2 per cent., and by defendant's witnesses at from 10 to 15 per cent. of the yeast sold in those parts of the country in which the Liberty Corporation operated. It is doubtless true that the patented process has been more efficient in the hands of the plaintiff than as used by the defendant company, and it may also be that there are economies of operation in the plaintiff's great business not available to businesses of smaller size. But there is no direct evidence on the point, and it is a mere balancing of probabilities to decide whether an efficient manufacturer of smaller size might not get the same favorable results so far as cost of manufacture is concerned. It also should be borne in mind that the evidence upon which plaintiff relies shows a comparison between the cost of the old and new systems in the plaintiff's factories and involves the efficient operation of each process under the most advantageous circumstances. The economies from large operations were as available in one case as in the other.

The plaintiff's general contention that large savings result from the Hayduck process is also strongly supported by other circumstances. The only yeast-making corporations, whose processes have been described in the evidence, made use of the infringing process. It is incredible that they not only adopted it, but also persisted in its

employment after the beginning of the litigation, unless it was to their commercial advantage to do so. Both the Federal and Liberty Companies undersold the plaintiff by a considerable margin, and nevertheless the Liberty Company was able to make a substantial profit under these competitive conditions. It is also significant, as stated in the foregoing quotation from the opinion of the court on the main trial, that the Fleischmann prices were increased only 7 per cent. between 1913 and 1923, notwithstanding the greatly increased costs of labor and material which affected all industries during this decade.

Upon the point under consideration, the master reached the following conclusion which seems to the court most conservative, in view of the testimony discussed: "The conclusion of the master arrived at after this consideration of the testimony as to savings is that, whereas it may not demonstrate with mathematical accuracy the exact number of cents per pound which the plaintiff did save or might have saved by the use of the patent in suit alone, as compared with its former all-grain process, it does tend to show that the savings were substantial and, further, that savings might have been made by the use of a like process by another company operated with reasonable business efficiency. The testimony should therefore be considered as a factor in the problem as to what is a reasonable royalty."

The master also took into consideration that, under normal conditions, a royalty for the use of a patent right must be fixed at such a figure as to enable the licensee to make a profit. Hence the reasonable expectation of profit in the use of the Hayduck process was discussed by the master in the light of the successful operations of the Fleischmann and Liberty Companies. There was evidence that the Fleischmann Company operated with great commercial success from 1923 to 1926, the period covered by the accounting. During this period the plaintiff sold yeast at prices averaging from 26 to 27 cents per pound, and made profits thereon ranging from 7 to 9½ cents per pound. These figures were later corrected and reduced by taking into account the effect of patents 105 and 106, which were used with patent 103 by the plaintiff after January 1, 1924. Thereby the yield of yeast was increased with a corresponding decrease in the cost per pound. Attributing all of the increase to the use of the later patents, the calculation showed that the profits which would have been obtained without them would have ranged from 6.9 to 7.7 cents per pound.

The accuracy of the figures, as attributable to the advantages of patent 103 is challenged by the defendant on a number of grounds: (1) The evidence does not show that account was taken of certain corporate expenses such as registration fees or income taxes. (2) The figures were not confined to plants in those parts of the country in which the defendant operated, but included all of the factories of the plaintiff during the period mentioned. (3) The figures included not only profits on the sale of bakers' yeast made by the all-molasses process, but also the profits on foil yeast made exclusively from grain and sold for household use or for consumption as such for health purposes. Approximately 90 per cent. of all the plaintiff's yeast is bakers' yeast and only 10 per cent. foil yeast. The cost of the latter is twice that of the former and its selling price three times as great. The master found that it would have been possible for the plaintiff to have separated the figures of the two kinds of yeast and to have shown separately the profit on each rather than an average profit on both; and so it must be held that plaintiff's profit figures cannot be accepted as accurate statements of the gains of the plaintiff through the use of the process in suit.

The master's conclusion on these figures was expressed in the following words: "On the whole, the conclusion of the Master is that whereas defendant's criticisms should not be given the full weight attached to them by the defendant, they are substantial and while weakening the force of this testimony, do not destroy it as an element to be taken into consideration in arriving at the amount of reasonable royalty."

The defendant put in evidence the experience of the Liberty Yeast Corporation. The master found that for a number of years it manufactured yeast in the all-molasses process with yearly sales of 9,000,000 pounds, at a loss of 3⅓ cents per pound, or a total loss of $300,000, per year. The management of the company changed in the early part of 1923, and the process was modified by the utilization of a mixed mash consisting of 60 per cent. molasses, whereupon the loss was changed into a profit of 2¼ cents per pound. The production rose under the new management from 9,000,000 pounds per year to a production of from 10,000,000 to 12,000,000

pounds. Thence the company continued to do a profitable business until its assets were acquired in 1925 by the plaintiff company. It is not possible to determine how much influence should be given to the various factors which contributed to change a substantial loss into a substantial gain. Doubtless the greater efficiency obtained under the new management and the increased sales of yeast were largely influential in bringing about the result; but it is significant that the new management retained the infringing process.

The defendant also produced the manager of the Liberty Company as an expert witness. He testified that from his experience the profit of 2¼ cents per pound represented the maximum amount which a concern of its size might expect to make from the manufacture and sale of yeast under the conditions as they existed at the time in question, and that, in his opinion as an expert, a reasonable royalty for the use of the patented process would not exceed one-half cent per pound.

The plaintiff on its part offered as an expert witness an officer of the Fleischmann Company, in charge of manufacturing operations, who gave the opinion that the saving figures did not represent the entire value in terms of cents per pound of the Hayduck process. He said that not only was the cost of production lower, but that the quality of the yeast, particularly its keeping quality, was improved. Reference has already been made to the savings of the plaintiff under the new process in shipping by freight instead of express, which was possible because of the better keeping quality of the yeast. But, while there was a substantial reduction of expense in this way, it amounted to only a small fraction of a cent per pound of yeast produced. No witnesses were produced to show that the plaintiff's yeast was preferred to that of other manufacturers by reason of its superior quality; so that the effect of this feature upon the plaintiff's business was largely a matter of opinion. The expert witness testified that it was the practice of the plaintiff company to refuse to grant license under any of its patents, and, considering this feature, as well as the improved quality of yeast produced under the Hayduck patent, it was his opinion that there should be added to the amount saved per pound in the manufacture of the yeast an additional 1½ cents, in order to ascertain what a reasonable royalty would be.

Taking all of this testimony into consideration, the master reached the following conclusions:

"Coming now to fixing an exact figure representing a reasonable royalty, the master has found this a difficult problem. On the one hand, the plaintiff has a long established business and is in a dominant position in the industry; on the other, the defendant is a comparatively small concern. We are required to find as best we may what these two parties, or more accurately, two imaginery parties in like situation would agree upon as a reasonable royalty. Plaintiff operates at a profit, some part of which is due to other patents then the one in suit, but the reasonable royalty would cover the use of the patent in suit alone. The plaintiff has been operating for many years and is thoroughly organized. The defendant lost money during the whole period, but that period was an exceedingly short one and a longer experience would have shown a different result. The Liberty Company, though much larger than the defendant, was relatively very much smaller than the plaintiff. It, too, had a short experience but in that short time was able to turn a loss into a gain. It is common experience that many businesses ultimately successful show losses during their experimental stage. As already stated, the continuance of the defendant in the business can be explained on no reasonable ground except it expected ultimately to be able to operate at a profit.

"Under the circumstances in evidence, the cost figures and the sale prices of the defendant are entitled to very little, if any weight, and the same is true as to the figures of the Liberty Company, though in a less degree. The plaintiff's evidence as to its manufacturing costs and profits are, for reasons already stated, to be taken with some discount. This likewise applies to its figures as to expenses. Consideration has been given to all these matters and others above referred to. ＊ ＊ ＊

"In the case at bar if the plaintiff were awarded damages on the theory of loss of profits through sales unlawfully diverted by the defendant, taking into consideration both the selling expenses and the influence of patents 105 and 106 and assuming that it would have made all sales that the defendant made, its recovery would be $263,-571.39. It is a practical though not a legal certainty in the view of the master that the plaintiff has sustained through loss of profits a very substantial part of this sum.
＊ ＊ ＊

"Loeffler's (plaintiff's accountant) revised figures as to savings show savings of 2.923 cents per pound. If to these actual savings the intangible savings of 1½ cents per pound were added, the result would be a saving of 4.423 cents per pound. But some deduction should be made from Loeffler's savings figures by reason of facts already discussed. Doubtless also a smaller yeast company would be unable by the use of the process of the patent in question to effect as large a savings as the plaintiff has shown, and consideration must be given to the competitive and other conditions already discussed at length and to the question as to what profit might be earned by a licensee after paying the royalty to be fixed. Having given all factors which seem to be relevant to the question their fair weight, the master has come to the conclusion that a reasonable royalty would be 2½ cents per pound.

"By all of the processes in suit the defendant manufactured and sold during 1923, 1924, 1925 and 1926, 3,680,426 pounds of yeast which at 2½ cents per pound equals $92,010.65. Accordingly the master recommends a decree assessing damages in that sum."

The defendant strenuously objects to this finding on the ground that the master ignored the requirement that a reasonable royalty should be fixed at a figure sufficiently low to permit the licensee to make a reasonable profit. · It is said that the experience of the Liberty Company shows that no yeast manufacturer of ordinary size could be expected to operate at a greater profit than 2½ cents per pound; that, even if the plaintiff's figure of 2.923 cents per pound is accepted as accurate, a royalty of one-half cent per pound is the extreme figure which would permit the business to survive; and that the plaintiff's expert testimony was too vague and conjectural to form a solid basis for the assessment of damages. Granting full weight to these contentions, it nevertheless seems to the court that the master's conclusions are supported by the evidence. It is clear from his opinion that he did bear in mind the element of reasonable profit by the putative licensee. He expressly said: "We are required to find as best we may what these two parties or more accurately, two imaginery parties in like situation would agree upon as a reasonable compensation"—and he was satisfied that a royalty of 2½ cents conformed to the rule.

It should be borne in mind in passing that the Liberty Company made 2¼ cents per pound whilst underselling the Fleischmann Company by a considerable margin.

. But, even if the figures do not justify the conclusion that a manufacturer could pay the royalty and still survive, the master's finding should be sustained. In the opinion of the court, this is not a case in which the damages figured in cents per pound need provide for the element of the licensee's profit. The savings of the plaintiff at the rate of 2.923 cents per pound has been established with reasonable certainty. Making due allowance for plaintiff's unusual size, it is fair to assume that the savings of any manufacturer of adequate resources and reasonable efficiency would be not less than 2½ cents per pounds by the use of patent 103. Hence the value of the property tortiously taken by the defendant is accurately expressed by this figure. No case of like circumstances has been cited wherein it has been decided that damages expressed in the form of a hypothetical royalty must leave room for the infringer's profit; and such a holding would be abhorrent to the well-settled rules designed for the protection of private property. The infringer should not be enabled, through the effect of his own wrongful act, to compel the owner of the patent to deal with him as if he were the lawful prospective purchaser of a license under the patent. If such were the case, any infringer could appropriate at will valuable patent rights and exercise them with a reasonable expectation of profit during the long period which usually ensues before the injunction of a court of equity can issue, depending upon the difficulty which the patent owner must meet in such cases to establish with reasonable certainty the profits of the industry attributable to the patent rights. The value of the misappropriated property in the case at bar has been ascertained with sufficient certainty, and it is not necessary to undertake the difficult task of estimating a hypothetical royalty.

The exceptions of the defendant to the findings of the master as to the amount of the plaintiff's damages will be accordingly overruled. The master found that defendant made and sold 3,680,486 pounds of infringing yeast, upon which the damages at the rate of 2½ cents per pound amount to $92,010.65, for which sum a decree will be passed.